2024 IL App (2d) 220281-U
No. 2-22-0281
Order filed April 4, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2254 |
| ISAAC T. ECHOLS, | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*: (1) Trial court did not err in denying defendant's motion to suppress evidence discovered by parole agents as a result of a search of a room defendant was renting during a parole compliance check on defendant's brother; (2) trial court did not deprive defendant of his right to mount a complete defense when it barred him from presenting evidence about his brother's history of firearm possession; (3) the unlawful possession of a weapon statute was not unconstitutional as applied to defendant; but (4) defendant's convictions of unlawful possession of a firearm without a firearm owner's identification card would be vacated pursuant to the one-act, one-crime doctrine.

¶ 2   Following a jury trial in the circuit court of Kane County, defendant, Isaac T. Echols, was

convicted of seven counts of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a)

(West 2018)) and seven counts of unlawful possession of a firearm without a firearm owner's identification (FOID) card (430 ILCS 65/2(a)(1) (West 2018)). The trial court sentenced defendant to a term of 10 years' imprisonment on each of the former convictions and a term of 5 years' imprisonment on each of the latter convictions, with all sentences to run concurrently. On appeal, defendant raises four issues. First, he argues that the trial court erred in denying his motion to suppress evidence discovered by parole agents resulting from the search of a room he was renting during a parole compliance check on his brother. Second, defendant contends that he was deprived of his right to mount a complete defense because the trial court barred him from presenting evidence at trial about his brother's history of firearm possession. Third, defendant asserts that his convictions of unlawful possession of a weapon by a felon should be reversed because, pursuant to *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 597 U.S. 1 (2022), the unlawful possession of a weapon statute is unconstitutional as applied to him. Fourth, defendant contends that his convictions of unlawful possession of a firearm without a FOID card should be vacated pursuant to the one-act, one-crime doctrine. We agree that defendant's convictions of unlawful possession of a firearm without a FOID card should be vacated pursuant to the one-act, one-crime doctrine, but otherwise affirm.

¶ 3                                    I. BACKGROUND

¶ 4       On January 23, 2019, defendant was charged with 20 counts of drug- and weapon-related offenses. The charges arose from items found on November 7, 2018, at 1315 Solfisburg Avenue in Aurora (Solfisburg Property) during a parole compliance check of defendant's brother, Terrell Alvarez (Terrell), conducted by parole agents of the Illinois Department of Corrections (Department) and the Aurora Police Department. The drug-related offenses (counts I through III and XI through XIII) were severed from the remaining charges and are not at issue in this appeal.

Counts IV through X alleged that defendant committed the offenses of unlawful possession of a weapon by a felon, a Class 3 felony. See 720 ILCS 5/24-1.1(a) (West 2018). Each count related to one of seven firearms that was found as a result of the parole compliance check. Counts XIV though XX alleged that defendant committed the offenses of unlawful possession of a firearm without a FOID card, a Class 3 felony. See 430 ILCS 65/2(a)(1) (West 2018). Each of those counts also related to one of the seven firearms that was found as a result of the parole compliance check.

¶ 5    The Solfisburg Property belonged to defendant's grandmother, Maria Alvarez (Maria). Sandra Vargas (Vargas), Isidoro Alvarez (Isidoro), Terrell, and Aleeya Alvarez (Aleeya) resided at the Solfisburg Property. Defendant also stayed there occasionally. At the time of the parole compliance check, Terrell was a parolee who was out of prison on mandatory supervised release (MSR). Before being released on MSR, Terrell signed a "Parole or Mandatory Supervised Release Agreement" (MSR agreement). The MSR agreement included "Rules of Conduct" that governed Terrell's MSR. Among other things, the rules of conduct provided that Terrell "shall consent to a search of [his] person, property, or residence under [his] control" (consent-to-search provision).

¶ 6                          A. Pretrial Proceedings

¶ 7    On January 31, 2020, defendant filed a motion to suppress evidence illegally seized. In his motion, defendant argued that the weapons and drugs found at the Solfisburg Property were the result of an illegal search by the Department's parole agents during a parole compliance check on Terrell. The motion provided in pertinent part as follows. Defendant lived at the Solfisburg Property with other family members, including his brother, Terrell. Defendant had his own bedroom at the Solfisburg Property. Defendant did not share his bedroom with anyone, and he did not allow others to enter the bedroom in his absence. Terrell slept either on the living room couch or in his sister's bedroom if she was not home. On November 7, 2018, parole agents, in conjunction

with the Aurora Police, conducted a parole compliance check on Terrell at the Solfisburg Property. The parole agents questioned every resident of the home present that day, and then without the consent of any of the residents, began a systematic search of the Solfisburg Property. The parole agents searched the living room, the common areas of the home, and the bedroom Terrell indicated he shared with his sister. The agents then proceeded to open every door in the home and look into every room, including defendant's bedroom (defendant's bedroom or south middle bedroom) and his grandmother's bedroom. Upon entering defendant's bedroom, the parole agents observed firearms. After finding the weapons, the police arrested the occupants of the home and obtained a search warrant. A subsequent search discovered items including narcotics, jewelry, United States currency, and firearms. The motion concluded that any evidence or statements obtained as a result of the illegal search by parole agents should be suppressed. A hearing on defendant's motion commenced on September 22, 2020.

¶ 8     At the hearing, defendant called Vargas. Vargas testified that on November 7, 2018, she lived at the Solfisburg Property with her grandmother (Maria), her uncle (Isidoro), and three of her cousins—Aleeya, Terrell, and defendant. Terrell was placed on parole at the Solfisburg Property in July 2018. The Solfisburg Property is a four-bedroom residence owned by Maria, to whom defendant paid rent. Maria is disabled and non-verbal. Vargas serves as Maria's caretaker and shares a bedroom with her. Isidoro has his own bedroom, defendant has his own bedroom, and Aleeya has her own bedroom. Terrell slept on the sofa in the living room, but would also sleep in Aleeya's room during the day when she was at work or school.

¶ 9     On the morning of November 7, 2018, Vargas woke up to a knock at the front door. She heard Terrell talking to someone, but could not make out what was being said. When Vargas left her bedroom, she saw Terrell sitting at the dining room table in handcuffs. She also saw two

officers standing against the wall next to Terrell. Vargas returned to her room. Sometime later, a female parole agent knocked on Vargas's bedroom door and asked who slept in that room. Vargas told the woman that she shared the room with her grandmother. The parole agent asked Vargas to step out of the room. The parole agent then entered the room and looked around with a flashlight, but did not search any drawers or cabinets. Vargas then returned to the room and closed the door. After the parole agent left her room, Vargas heard movement in defendant's bedroom, which was adjacent to her room. Vargas could not see what was happening, but described the sound as a "dresser bang[ing] against a wall." Once the noise ceased in defendant's room, Vargas went to the kitchen to make breakfast for her grandmother. Aleeya, Isidoro, and Terrell were not in the house, but four police officers were standing in the dining room. Vargas asked the officers what was going on. The officers responded that Aleeya, Isidoro, and Terrell were taken in for questioning and that they were waiting for a search warrant. Vargas testified that she never consented to a search of her room or any other room in the house. Moreover, the officers never asked Maria, the owner of the house, for permission to search.

¶ 10    Vargas testified that the only way to access defendant's bedroom was though a door off the living room. The door in the living room, which is generally locked, leads to a small hallway. On the left side of that hallway is another door that leads upstairs to the attic. At the end of the hallway is the door to defendant's bedroom. Defendant's bedroom door is generally kept closed.

¶ 11    On cross-examination, Vargas admitted that she did not know if the living room door to the hallway was locked on the morning of November 7, 2018. She also admitted that she did not know who went in and out of defendant's bedroom because she was focused on caring for her grandmother. Vargas acknowledged that when Terrell was paroled to the Solfisburg Property he

had the ability to move around the house and enter its various rooms, including that of defendant. Vargas did not think there was a lock on defendant's bedroom door.

¶ 12    Steven Miller, a parole agent with the Department, testified that he participated in the parole compliance check of Terrell on November 7, 2018. There was a meeting with the Aurora Police at 5 a.m. that morning to discuss the parole compliance check. Three parole agents and more than five Aurora police officers were present for the meeting and participated in the parole compliance check.

¶ 13    Miller further testified that the group arrived at the Solfisburg Property at around 8 a.m. Miller and his fellow parole agents, Christina Samuelson and Michael Magana, knocked on the front door while the police officers were staged outside. When Terrell opened the door, he was informed the agents were conducting a parole compliance check. Terrell, who was wearing shorts and a t-shirt, was immediately handcuffed and patted down. Miller asked Terrell "how would he do on a drop." Terrell responded that he would be "dirty" for marijuana. Terrell and the other people in the house were directed to sit at the dining room table. At that time, there was neither a parole warrant for Terrell nor a search warrant for Terrell's person or the Solfisburg Property.

¶ 14    Miller identified defense exhibit A as the Department's "Parole Division Operating Procedural Manual" (Manual) in relation to "Searches of Offenders & Inmates on Electronic Monitoring or Parole." Miller confirmed that the Manual was in effect at the time of Terrell's parole compliance check. Miller read a passage from the Manual that provided as follows: "Parole agents and parole commanders shall request voluntary consent or permission from the host and/or offender before conducting a search of the residence or vehicle." Miller agreed that none of the parole agents asked for the consent of Terrell or Maria, who was the host. The Manual also stated that offenders are subject to a protective pat down when reasonable articulated facts exist to

indicate that the offender is in possession of contraband, may be armed, or presents a danger to the parole agents or the general public. Miller acknowledged that Terrell, who was dressed in shorts and a t-shirt, did not appear to be armed. Further, Miller admitted that he had no reason to suspect that Terrell was in possession of any contraband or presented a danger when he opened the door. Miller stated that he handcuffed Terrell for the security of both Terrell and himself.

¶ 15    Miller testified that the parole agents asked Terrell what part of the house he controlled and where he slept. Terrell directed them to a bedroom, and the parole agents searched that room. No contraband was found in the bedroom. After searching the bedroom in which Terrell indicated he slept, the agents searched the area around the living room sofa. They found a hoodie, a pair of pants, a pair of shoes, and a gold chain in that area, but did not find any contraband. Miller testified that based on what was found, it seemed inconsistent that Terrell lived in that area. Moreover, based on the search of the bedroom, Samuelson expressed concern about whether Terrell actually stayed in that room. When Samuelson asked Terrell where his belongings were, he did not respond.

¶ 16    The parole agents decided to do a security sweep of the house to see if there was anyone hiding in the other rooms. Miller testified that the door from the living room to the hallway leading to defendant's room was open. Miller thought the door to the bedroom was open before Samuelson entered. However, Miller was in the living room when Samuelson entered defendant's room and did not actually see how she was able to enter. Terrell never indicated that he slept in defendant's room, and Samuelson went into defendant's bedroom without asking anyone for consent to do so. After Samuelson went into the room, she spoke to Magana. Magana then called the Aurora Police into the house. Miller estimated that the officers entered the house within 20 seconds. Magana and Samuelson led the officers to defendant's bedroom. They did not have a search warrant.

¶ 17    Per the Manual, if a parolee does not consent to a search of the home, agents should contact their commander along with local law enforcement to discuss if they should apply for a search warrant. The Manual also states that people present in a residence with a parolee are not subject to a search or arrest by parole agents. Defendant was not present for the search, and Miller did not make contact with defendant at any point.

¶ 18    Miller explained that a host site agreement is a document signed by the person who owns the home where a parolee will be living that lists the rules for the parolee and the host site. Miller never looked at the host site agreement for Terrell to stay at Maria's house. Miller also explained that a parolee signs an MSR agreement to be released, which gives his or her consent for searches of his or her person and the area of the residence which he or she controls. It was Miller's understanding that if a parolee did not sign an MSR agreement, he or she "wouldn't go on parole." According to Miller, that was why he never asked for Terrell's consent to search. However, Miller admitted that he had not seen an MSR agreement signed by Terrell or a host site agreement signed by Maria before entering the house that day. Miller did not know if there was a host site agreement in this case and, if there was, who may have signed it. Finally, Miller stated that the parole agents executed the parole check on Terrell that day because the Aurora Police asked them to do so. He did not know why the police selected Terrell for a check that day.

¶ 19    Juliete Merlo testified that she was assigned as Terrell's parole officer in July 2018. Her first contact with Terrell was on August 17, 2018, in person in front of his host site. At that time, Terrell was in compliance with the conditions of his parole. Merlo's second contact with Terrell was on September 8, 2018, at the host site. He had not yet made an appointment for his parole orders, but was otherwise compliant. On cross-examination, Merlo said that both her checks took place outside the residence, so she could not say for certain whether Terrell had a firearm inside

the house. Merlo also stated that Terrell would have had an MSR agreement in place. Merlo had never seen a host site agreement in this case and did not know if one was ever prepared.

¶ 20     Christopher Shive testified that he was assigned as Terrell's parole officer in October 2018. Shive did a host site visit with Terrell on November 4, 2018. Shive's visit took place inside the home, specifically in the living room. He spoke with Terrell for 5 or 10 minutes. Shive did not review the host site agreement for Terrell's case. Shive also stated that he had no reason to think Terrell was not living in the house and no reason to arrest Terrell or seek a warrant for non-compliance with the conditions of parole.

¶ 21     Timothy Young, a gang investigator in the special operations group for the Aurora Police, testified that he attended the 5 a.m. meeting between parole agents and police officers on November 7, 2018. There were seven police officers and three parole agents present. The purpose of the meeting was to discuss the plan for the parole compliance checks to be executed that day. One of the checks performed that morning was on Terrell at the Solfisburg Property. At the time, Young believed that defendant also lived at that address or at least frequented the house.

¶ 22     When the group arrived at around 7:15 a.m., the police officers were staged around the corner from the Solfisburg Property as parole agents entered the house. According to Young, the parole agents called the police into the house "[w]ithin minutes" of their arrival. When Young entered the house, he saw Terrell cuffed with his hands behind his back at the kitchen table. Magana directed Young and the other officers to the south middle bedroom of the house. Magana stated that some firearms and suspected narcotics were located there. Prior to entering the bedroom, Young did not see any contraband. Young accessed the bedroom through a doorway, which was open. Once he entered the bedroom, Young saw several guns as well as what he believed to be drugs in plain view. There was a large amount of clothing in the bedroom, including men's shoes

in sizes 9½ and 12. Young admitted that he did not have a warrant when he entered the bedroom, and he did not have the consent of any resident of the house.

¶ 23    After observing the contraband, the police officers "secured the residence at that point" to check whether there were more people in the house. During that search, Young looked at the living room. He found several items belonging to Terrell around the couch, including a sweatshirt, jeans, shoes, and a phone charger. Young checked the sizes of the jeans and the shoes.

¶ 24    Young also searched the southeast bedroom where he encountered Isidoro. Isidoro later stated that Terrell had been staying in the house every night since being paroled. Terrell used to sleep in the south middle bedroom, but had moved to the couch when the heat stopped working in that bedroom. Young did not see any contraband in Isidoro's bedroom. On redirect, Young clarified that the conversation with Isidoro about Terrell's sleeping arrangements occurred at the police station after Isidoro had been arrested.

¶ 25    Young then proceeded to the southwest bedroom of the house where he observed both male and female clothing. He remembered seeing at least two pairs of men's underwear and men's shoes. Magana also informed Young he had observed male clothing. Young did not remember whether he looked at the size of the shoes in the southwest bedroom.

¶ 26    Following the search of the house, the residents were placed under arrest and transported to the police station. Young could not remember how long it was between the time he entered the house and the arrests, though he thought it was more than 10 minutes. Several police officers remained in the house after the residents were arrested and removed.

¶ 27    Matt Huber, a gang investigator with the special operations group of the Aurora Police, testified that he participated in the 5 a.m. meeting on November 7, 2018. Huber believed that there were seven Aurora police officers and three parole agents at the meeting. Huber estimated the

group arrived at the Solfisburg Property at about 6:45 a.m. Huber and the other police officers remained in their cars while the parole agents entered the residence. Approximately 10 or 15 minutes later, the parole agents called police into the house.

¶ 28    When he entered the house, Huber saw Terrell handcuffed and sitting at a table. Isidoro was also seated at the table with parole agents standing near the table. The parole agents directed Huber and the other officers to the south middle bedroom, saying there was something they needed to see. The door to the bedroom was ajar. Upon entering the room, the parole agents pointed to two firearms on top of an armoire, a rifle against the wall, and some pills on another dresser. Huber stated that there was no conversation before the parole agents led him to the bedroom—it was "instantaneous" upon entering the house.

¶ 29    Given that there were firearms in plain view, Huber and the other officers conducted a cursory search of the home to make sure no one else was present. Huber did not remember which specific areas he checked, but he believed the entire home was searched. Huber stated that he was not involved in interviewing any of the people in the home and he did not know if the parole agents had talked to the residents before calling for the police to enter.

¶ 30    Huber also testified that he took a video of the house after the search warrant was issued but before the search took place. Huber was in charge of evidence collection when the search warrant was executed. Per the search warrant, he collected several firearms and what appeared to be narcotics from the south middle bedroom. He also found a Social Security card belonging to Terrell in that bedroom.

¶ 31    Aurora Police Investigator Blaskey testified that he too was involved in the 5 a.m. meeting on November 7, 2018. The purpose of the meeting that morning was to review the plan for the parole compliance checks being conducted that day. According to Blaskey, a parole compliance

check allows "the Illinois Department of Corrections to go verify parolees at their residence where they were staying and conduct a search of the residence."

¶ 32    Blaskey thought the group arrived at the Solfisburg Property around 7:15 a.m. The police officers were staged about a block away while the parole agents entered the house. Less than five minutes later, the parole agents radioed for the police officers to enter because they found several firearms. In response, the officers entered the home without a warrant and without consent from anyone in the home. Terrell was seated at the kitchen table in handcuffs when they entered.

¶ 33    Blaskey went to the bedroom on the southwest side of the house, directly across from the bathroom. There were two women in the room—Vargas and Maria. Vargas told Blaskey that she and Maria shared the room they were currently in, Aleeya stayed in the bedroom next to hers, Isidoro stayed in the far bedroom on the east side of the house, Terrell slept on the couch in the living room, and defendant stayed in the bedroom next to the stairway to the attic.

¶ 34    Following Blaskey's testimony, the defense admitted exhibit A (the Manual) and exhibit F (emails from the Aurora Police to the Department requesting and organizing the parole compliance check on Terrell). The defense then rested on the motion.

¶ 35    The State first admitted a video of the interior of the Solfisburg Property. According to the State, the video was taken after the search warrant had been signed, but before it had been executed. The State then called Christina Samuelson, a senior parole agent with the Department. Samuelson testified that the Aurora Police contacted her unit to do a parole compliance check on November 7, 2018. One of the checks scheduled for that day was Terrell. On the date of the check Samuelson worked with parole agents Miller and Magana and five or six members of the Aurora Police.

¶ 36    According to Samuelson, the purpose of a parole compliance check is to make sure that a parolee is living where he or she says, is in compliance with his or her MSR agreement, and does

not have any contraband. Samuelson indicated that the agents look for mail with the parolee's name on it, personal identification, clothing in the parolee's size, and other property to verify residency. There was no indication that Terrell was not living at his listed address or was otherwise not in compliance with the terms of his parole based on his previous parole checks.

¶ 37 When the group arrived at the Solfisburg Property, the police officers remained in their cars on the street as the parole agents knocked on the door. Terrell answered the door and invited the parole agents inside. Upon entering the front door, the parole agents were in the dining room. Samuelson told Terrell that they were doing a parole compliance check. Terrell was placed in handcuffs and seated at the dining room table. According to Samuelson, Terrell seemed extremely nervous—he was shaking, sweating, and giving vague answers to her questions. Miller asked Terrell about his drug usage, and Terrell said that he would test positive for THC (tetrahydrocannabinol).

¶ 38 Samuelson asked Terrell where he slept and kept his personal property. Terrell responded that he slept on a couch and kept his property in a back bedroom, to which he gestured. According to Samuelson, Miller searched the living room area and reported that there were no items belonging to Terrell there. Samuelson herself did not observe any belongings in the living room area, so she went to the bedroom indicated by Terrell. Upon entering the bedroom, Samuelson saw what she thought was a girl's room because there was one twin bed and pink décor. Samuelson did not open any drawers or containers in her search, and she did not find any possessions that she could identify as belonging to Terrell. Samuelson did not believe that Terrell kept his belongings in that room. Samuelson again asked Terrell where he kept his belongings. Terrell stated that he did not have any belongings. Upon further inquiry, Terrell denied having any clothes, an identification card, shoes, wallet, or a cell phone. Those answers concerned Samuelson, so she wanted to search the

house to determine whether Terrell was actually living at the Solfisburg Property and also to make sure that there were no people in there.

¶ 39    Samuelson noticed another bedroom in a hallway off the living room, so she decided to go there. There was a door between the living room and the hallway. Samuelson testified that that door was open. The hallway had a door to a staircase leading to an attic and a door to the bedroom. The door from the hallway to the bedroom was open. Because that area of the house was dark, Samuelson illuminated her flashlight. As Samuelson was walking from the living room through the hallway into the bedroom, she observed the butt of a handgun hanging off the edge of a chest of drawers. Samuelson later clarified that she could see the gun on the dresser while standing in the hallway by the door to the attic. She then noticed two more handguns and a magazine for a rifle on top of the dresser. Samuelson also saw a rifle behind the bedroom door. After finding the guns, Samuelson left the room and told Miller and Magana to request assistance from the police. Samuelson estimated that 5 or 10 minutes passed between her entry into the home and her request for the police.

¶ 40    When the police arrived, Samuelson led them to the bedroom where she saw the guns. Samuelson then went to the dining room. It was her understanding at that point that the police were going to apply for a search warrant. Samuelson waited at the house while the police obtained a search warrant. While waiting for the warrant, Samuelson did not see anyone conduct a search of the house. Samuelson was not involved in the execution of the search warrant, but she remained on the scene while the police performed the search.

¶ 41    On cross-examination, Samuelson acknowledged that there was no indication that Terrell was not living at his listed address or was otherwise not in compliance with the terms of his parole based on his previous parole checks. Samuelson stated that she was not aware that Miller had

found a pair of pants, shoes, phone charger, and necklace in the living room area. Samuelson also acknowledged that she did not ask Terrell or any other resident for consent to search the bedroom in which the firearms were found and there was no search warrant at the time. Samuelson stated that Terrell did not have a written host site agreement because he was not on electronic monitoring. As such, he would have been released on verbal consent. Samuelson did not know who the host for the verbal host site agreement was, nor did she review any of that information before November 7, 2018.

¶ 42     Defense counsel showed Samuelson defense exhibit A, the Manual. According to the Manual, a protective pat down of a parolee can occur when there are reasonable articulable facts to indicate that he or she is in possession of contraband, is armed, or presents a danger to the safety of the officers or the public. Samuelson testified, however, that the rules are different at the host site where the parole officers are allowed to handcuff and pat down the parolee without reason. Another provision of the Manual provides that the parole agents shall obtain the consent of the parolee or host before conducting a search of the residence. Samuelson admitted that she never asked Terrell for consent to search the home. However, she stated that a parolee is aware that he or she can be searched at any time as part of the verbal host site agreement and the MSR agreement. Samuelson knew that the host in this case was Maria, Terrell's grandmother. There was also a provision in the Manual outlining what an agent should do if a host denies permission to search. Nevertheless, none of the parole agents asked Maria for her consent to search the home.

¶ 43     On redirect-examination, Samuelson explained that to be released, a parolee must have an MSR agreement. One of the provisions of the MSR agreement is that the parolee shall consent to a search of his or her person, property, and residence under his or her control. Terrell signed such an MSR agreement. A parolee also must identify the address, or host site, where he or she will be

living. This is contained in a host site agreement, which can be written or verbal. A written host site agreement is required when the parolee is going to be released on electronic monitoring. Terrell was not on electronic monitoring, so a verbal agreement would be allowed. In the absence of a host site agreement, a person will not be released from custody. Thus, there must have been some form of host site agreement in Terrell's case. Samuelson believed that the provisions in the Manual do not apply to parole compliance checks.

¶ 44 Matthew Bowman of the Aurora Police testified that he was involved in the parole compliance check on November 7, 2018, as part of the gang division of the special operations group. The group arrived at the Solfisburg Property at around 7 a.m. The police waited outside the residence as the parole agents entered. At some point, Bowman and the other officers were called into the house by the parole agents because they found weapons and possible contraband.

¶ 45 Upon entry, Bowman saw Terrell, Aleeya, and Isidoro in the dining room, but he did not speak to them at that time. The police then secured the residence. They were making sure there were no other people in the house for safety reasons. Bowman secured the kitchen, bathroom, southwest bedroom, and attic. He did not find anyone in those areas. The police then did a secondary clearance of the home to make sure they did not miss something the first time. As part of the secondary clearance, Bowman entered the south middle bedroom where the contraband was found. After the house was cleared for the second time, Bowman returned to the dining room and spoke with Isidoro. Isidoro said that Terrell customarily slept in and kept property inside the south middle bedroom but now only did so occasionally due to the cold weather.

¶ 46 Bowman then went back to the police station to apply for a search warrant. Bowman prepared the warrant and met with a judge as the affiant. Once he obtained the warrant, Bowman returned to the Solfisburg Property and participated in the search. As a result of the search, the

police found size 9½ and size 12 shoes in the south middle bedroom. Terrell's shoes were taken when he was arrested and Bowman was able to verify that they were size 9½.

¶ 47    Bowman also spoke with Isidoro at the police station. Isidoro told him that Terrell used the south middle bedroom daily and stored his property there. Isidoro also said that the clothing and other property in that room should all belong to Terrell because he is the only person to use the room on a regular basis. Finally, Isidoro said that defendant visited the property frequently, but did not always sleep there at night. When defendant was visiting, he hung out with Terrell in the south middle bedroom.

¶ 48    Terrell refused to speak to investigators at the police station. He did, however, make a comment that suggested that the south middle bedroom was his: "Parole just came up into my house and went straight to my room even though I told them I didn't keep anything in there. I told them all my stuff was on the couch."

¶ 49    On cross-examination, Bowman admitted that his conversation with Isidoro at the home is not detailed in any police report related to defendant's case. Bowman also stated that Isidoro was never arrested and that he went to the Aurora police station "on his own accord voluntarily." On redirect-examination, Bowman testified that although the conversation he had with Isidoro is not referenced in the police reports, it was included in the affidavit he prepared for the search warrant in this case. After Bowman's testimony, the State rested.

¶ 50    In rebuttal, defendant first called Samuelson. Samuelson testified that she was able to see items in the south middle bedroom prior to actually stepping foot inside the room.

¶ 51    Isidoro testified that he lived at the Solfisburg Property on November 7, 2018. That morning, he was standing in the living room when people started to walk through the front door. He was directed to sit down at the dining room table with Aleeya and Terrell. He was then

handcuffed and taken to the Aurora police station, where he was fingerprinted, swabbed, and put in a cell before he was eventually released. Isidoro stated that he did not remember speaking to any police officers in his home that morning.

¶ 52    The defense then recalled Bowman. Bowman acknowledged that when he first testified in this matter, he said that Isidoro was not arrested. In fact, Isidoro was arrested and transported to the police station at 7:30 a.m. Bowman himself is listed on the paperwork as having authorized the arrest. The defense then rested.

¶ 53    Argument was held on the motion to suppress on June 11, 2021. Defendant argued that this was a normal parole compliance check and the parole agents had no articulable facts to suggest that Terrell was somehow in violation of his parole or that they needed to be afraid for their safety during this check. Moreover, the parole agents were aware of the fact that this was a parole compliance check in a home where there were other non-parolee residents who lived in the house and had an expectation of privacy. While the MSR agreement signed by Terrell gave the agents permission to search Terrell's person and property, there was no host site agreement in this case giving them permission to search the whole house. When the agents entered the house and immediately handcuffed Terrell, that was a seizure. The compliance check ended when Terrell was seized and everything that follows was an unconstitutional search.

¶ 54    The State argued that it was reasonable for the parole agents to enter the house and perform the compliance check because Terrell was on parole. The fourth amendment rights of the other residents of the house were implicated by Terrell's status as a parolee. In response to questioning from the court, the State acknowledged that even if a door is open, it does not mean a parolee has control over that area. Additionally, "under his control," is a limitation on the parole agent's power.

It does not open up the entire house to a search unless there is a host site agreement stating as much, which was missing in this case.

¶ 55　The trial court denied defendant's motion to suppress. In support of its ruling, the court found the following. Terrell was a resident of the Solfisburg Property, having been paroled to the residence sometime before November 7, 2018. When Terrell was released by the Department, he "gave his consent to a search of his person, property, or residence under his control." Consequently, at the time of the parole compliance search, "any area of the Solfisburg residence was under control of Terrell *** if he had access." Parole agents therefore "had authority to walk through all accessible areas of the Solfisburg [Property] for safety reasons, and to discover any parole violations of the parolee, Terrell." Limiting access on a parole compliance search to the areas the parolee indicates were under his or her control would undermine the efficacy of the search. The parole agents observed possible contraband in the south middle bedroom of the Solfisburg Property. At the time, the parole agent "was in a position that she had a legal right to be and made a legal observation of possible contraband in an area accessible to the parolee." Since the parole compliance search was limited to areas under which Terrell had "access/control," the scope of the search was within statutory limits.

¶ 56　Defendant filed a motion to reconsider, arguing that the trial court erred in denying the motion to suppress. Specifically, defendant argued that the court incorrectly interpreted case law given the fact that defendant was not a parolee and therefore had an expectation of privacy in the south middle bedroom. Additionally, defendant took issue with the court's finding that Terrell had control over any area which he could access as there is no case law defining control in that way. The court declined to change its ruling, stating that the search was justified because parole agents were not required to rely on what a parolee told them.

¶ 57                                    B. Terrell's Plea

¶ 58    Terrell was charged with possessing the same guns as defendant. Prior to defendant's trial, Terrell pleaded guilty to one count of unlawful possession of a weapon by a felon. The remaining gun counts against Terrell were *nolle prossed*. Terrell was sentenced to seven years' imprisonment.

¶ 59                                    C. Defendant's Trial

¶ 60    On May 5, 2022, the matter proceeded to a jury trial on the weapons charges. The State opened its case by admitting into evidence People's exhibit No. 31, a certified copy of a conviction of theft, a Class 3 felony, of defendant dated February 27, 2013.

¶ 61    The State then called Bowman of the Aurora Police. Bowman testified that he was familiar with defendant and his brother, Terrell. At the time of the investigation, Bowman knew that defendant did not live in Aurora. Defendant previously lived in Aurora, and Bowman had interacted with him several times at the Solfisburg Property. Bowman knew that defendant was in a relationship with a woman named Luisa Aguilar and that they had children together.

¶ 62    Bowman stated that he was involved in the execution of a search warrant at the Solfisburg Property on November 7, 2018. As a result of that warrant, Terrell was arrested. While Terrell was being processed at the police station, Bowman learned that Terrell wore size 9½ shoes. Defendant was not present at the time the search warrant was executed, but he was arrested in connection with that search. While defendant was being processed at the police station after his arrest, Bowman learned that defendant wore a size 12 shoe.

¶ 63    On November 16, 2018, Bowman was told by a Department phone call analyst that defendant received a phone call from an inmate on November 14, 2018. Bowman requested and received a copy of that phone call. The call lasted for just under 30 minutes and consisted of two male voices—one softer and one louder. Bowman did not recognize the louder voice, but he did

recognize the softer voice as defendant. Bowman had spoken to defendant about 10 times in the past. The softer voice also said things that led Bowman to think it was defendant. The man with the softer voice said that the house where the search warrant was executed belonged to his grandmother, and Bowman knew that the Solfisburg Property belonged to defendant's grandmother. During the call, the softer voice explained that the police went into his room and found his "bangers" and "everything." Bowman testified that "bangers" is a slang term for firearms. The softer voice also said that he told his attorney his fingerprints would be on everything. Defendant was arrested on November 17, 2018.

¶ 64    On cross-examination, Bowman stated that defendant "frequented" the Solfisburg Property and had an additional address elsewhere. Defendant was ultimately located at an address in Oswego. He admitted that the police never interviewed Aguilar, defendant's live-in girlfriend.

¶ 65    Bowman further explained on cross-examination that Terrell was the actual target of the investigation on November 7, 2018. As part of that investigation, Bowman and six other police officers met with parole agents at 5 a.m. that morning. The police officers were waiting a block away from the house when the parole agents entered the house. As a result of that search, three guns were located in a Chicago Cubs backpack along with some ammunition. Bowman acknowledged that there was a fingerprint lab inside the Aurora police station. If he wanted anything checked for fingerprints, all he had to do was complete a form. Nevertheless, to Bowman's knowledge, the Cubs bag was not tested for fingerprints or DNA. The guns inside the bag, however, were tested.

¶ 66    Bowman testified that when defendant was arrested, he had two cell phones in his possession. Bowman obtained a search warrant for the phones and reviewed their content. Neither

phone contained any photos of the guns. Bowman believed there may have been a text involving a slang term for guns, but he could not remember who it was with or when it occurred.

¶ 67    Bowman was also present for the interrogation of defendant's and Terrell's uncle, Isidoro. During that interrogation, Isidoro told police that when defendant visited the house, he spent a significant amount of time in the south middle bedroom with Terrell.

¶ 68    Aurora Police Investigator Tom Griffin testified next. Griffin was involved in the execution of the search warrant at the Solfisburg Property on November 7, 2018. Griffin's role was to search and assist with evidence collection. Griffin identified People's Exhibit No. 30 as a video of the south middle bedroom where the guns were found. The video was published to the jury. In that video, the camera pans around the room showing a pile of shoes and shoe boxes in one corner, two firearms sitting on top of a dresser, and a rifle propped up against the wall behind a dresser. After executing the search warrant, police found another handgun on top of the dresser, hidden under several items. They also found three more handguns and ammunition inside a Chicago Cubs bag on the floor near the door. The guns in the Cubs bag were wrapped in a white t-shirt. There was no identification in the Cubs bag. An empty rifle case was found on top of the bed in the room.

¶ 69    Griffin also stated that inside one of the dresser drawers, police found various pieces of identification belonging to defendant. There was a voter registration card, a City of Aurora citation, an Aurora Police Department citation (People's exhibit No. 12), receipts from a dry cleaner, and a casino player's card, all in defendant's name. A black wallet with defendant's social security card was also found on one of the dressers in the room. The wallet did not contain a driver's license, credit cards, or cash. Police also found items belonging to Terrell in the room, including multiple pieces of mail and a social security card (found under the bed).

¶ 70    Officer David Adams of the Aurora Police testified that he worked on this case as an evidence technician. Adams was asked by another evidence technician, Alvin Soto, to process two of the guns (Smith & Wesson revolver and CZ52 handgun) recovered in this case. Adams swabbed both guns for DNA and checked for fingerprints. Adams did not find any prints on either gun he processed. On cross-examination, Adams admitted that none of the unfired bullets recovered in this case were tested for fingerprints, although several magazines were. He also stated that the Cubs bag that contained three of the recovered guns was not tested for DNA, nor was the t-shirt in which several of the guns were wrapped.

¶ 71    Officer Alvin Soto testified that in November 2018, he worked for the Aurora Police as an evidence technician. Soto processed one rifle, one revolver, and three handguns (Bushmaster rifle, Springfield Arms handgun, Ruger handgun, Glock handgun, and a Colt revolver) that were recovered in this case. He first swabbed all the firearms for DNA and then checked for fingerprints. Soto was unable to find any suitable prints for comparison on any of the firearms he analyzed.

¶ 72    The State then entered two stipulations into evidence. The first, People's exhibit No. 33, was a stipulation that defendant did not have a FOID card and was ineligible to have a FOID card at the time of the alleged offense due to a prior felony conviction. The second, People's exhibit No. 34, was a stipulation regarding the results of DNA testing of the seven firearms recovered from the south middle bedroom of the Solfisburg Property. Per the stipulation, swabs taken from all seven firearms were tested for DNA. Those swabs were compared with known standards taken from Terrell and defendant. The results from five of the firearms were inconclusive. One of the firearms (Springfield Arms handgun) contained two profiles—the major profile excluded both defendant and Terrell and the minor profile was inconclusive. Another firearm (Ruger handgun)

contained two profiles—the major profile excluded defendant but included Terrell, and the minor profile was unable to be tested.

¶ 73    Sean Furlow, an employee of Statesville Correctional Center, testified that in 2018, he worked as a correctional officer and was assigned to the Department's intelligence unit. Part of his job included monitoring inmates' phone conversations. Furlow explained that for an inmate to make a call, he or she must complete a form with the contact's phone number, name, address, and relationship. If the contact is approved, then the inmate can call that phone number. To dial out, the inmate must input their ID number, a PIN number, and the phone number he or she wants to call. The Department has an automatic system that records all inmate calls. Both the inmate and the recipient hear an automated message before the call starts that informs them that the call will be recorded.

¶ 74    In November 2018, Furlow was asked to search the system of recorded calls for a specific phone number. As a result of that request, Furlow accessed a call made by inmate Juan Vargas on November 14, 2018. When he listened to the call, Furlow heard something he believed should be reported, so he forwarded the call to his supervisor. Furlow identified People's exhibit No. 1 as a recording of that call. The State moved to admit and publish the call. The recording was admitted over defendant's objection and played for the jury. The State rested and the defense moved for a directed verdict, which was denied.

¶ 75    Prior to the start of defendant's case, the State moved to bar the defense from asking Terrell about his past gun ownership and gun charges. Over defendant's objection, the trial court granted the State's motion, finding that such evidence would constitute improper character evidence.

¶ 76    Defendant called Shive, a parole agent for the Department. Shive stated that Terrell was a parolee assigned to his case load in November 2018. Shive met with Terrell at the Solfisburg

Property on November 4, 2018. That meeting took place in the living room of the residence and lasted about five minutes. Shive did not search the bedrooms, and he did not observe any issues with the host site.

¶ 77    Samuelson testified that she was one of three parole agents who took part in the parole compliance check of Terrell on November 7, 2018. After an early morning meeting with officers at the Aurora police station, the group arrived at Terrell's house around 7:30 a.m. While only the parole agents entered the house at first, the police officers were in close proximity. Upon entering the house, Samuelson put Terrell in handcuffs and had him sit at the dining room table with his uncle and sister. His demeanor was nervous—he was talking fast, sweating, and not being truthful. Samuelson asked Terrell where his bedroom was. Terrell indicated that a bedroom in the back of the house was his, and Samuelson proceeded to search that room. The room contained one twin bed and pink décor. Samuelson testified that the bedroom looked like it contained "all girls' belongings." She did not see any men's clothing. Samuelson exited the bedroom and asked Terrell more questions. When Samuelson asked Terrell where all his belongings were (clothing, parole paperwork, cell phone, shoes), Terrell denied having any possessions. The parole agents then decided to search other areas to locate Terrell's belongings. The door to the south middle bedroom was open, and Samuelson pointed her flashlight towards the room. There was no one in the room, but Samuelson saw the handle of a gun on top of a dresser. When she moved her flashlight, she saw another gun on the same dresser. She told the other parole agents what she found, and they called the police officers to recover the firearms. The police were inside the house less than a minute later.

¶ 78    Defendant then called Terrell. Terrell testified that his nicknames are "T" and "Homicide." He was charged with possession of the same seven guns defendant was charged with in this case.

On November 18, 2021, Terrell pleaded guilty to one count of unlawful possession of a weapon by a felon, a Class 2 felony, and was later sentenced to seven years' imprisonment.

¶ 79    Parole agent Miller testified that he took part in the parole check on Terrell on November 7, 2018. Miller testified that after Terrell was handcuffed and seated at the dining room table, he asked Terrell where he slept. Terrell said he slept in the living room, so Miller searched that area. Miller found a pair of pants and a sweatshirt on the couch. Miller described Terrell's demeanor as "fidgety" after Miller searched the living room. Miller testified that he was able to see into the south middle bedroom from the living room area.

¶ 80    Isidoro, defendant's uncle, testified that he has lived at the Solfisburg Property all his life. In November 2018, he resided there with his mother, her caretaker (Vargas), his niece Aleeya, and his nephew Terrell. Terrell came to live at the house when he was paroled.

¶ 81    On November 7, 2018, Isidoro woke up to knocking at the front door. When he exited his room, he saw Terrell peeking through the window and hesitating to answer the door. Isidoro asked who it was, and Terrell said it was parole. Isidoro prompted Terrell to open the door. Parole then entered the house, cuffed Terrell, and sat him down at the table. The agents told Isidoro to sit at the table too, and he complied. When Aleeya, his niece, came out a few moments later, they told her to sit at the table as well. Eventually, the officers handcuffed Isidoro and removed everyone from the house. He was not interviewed at the house, but was transported to the police station.

¶ 82    Isidoro stated that the south middle bedroom belonged to Terrell. In November 2018, Terrell was sleeping in the living room because his bedroom was too cold. At that time, defendant was not staying at the Solfisburg Property. Defendant was living in his own house with his girlfriend and their kids. Isidoro also testified that he was in the south middle bedroom about a

week before the search warrant to move a television. While he saw some mess and clutter, he did not see any firearms.

¶ 83    On cross-examination, Isidoro testified that while defendant was not living in the house in November 2018, he was renting the south middle bedroom and was at the house frequently. On re-direct examination, Isidoro clarified that defendant was renting the room, but Terrell was sleeping in the room. Defendant was renting the room to help his grandmother with her bills and to have a place to stay occasionally when he argued with his girlfriend.

¶ 84    Aleeya, defendant's and Terrell's sister, testified that she has lived at the Solfisburg Property her entire life. Aleeya stated that defendant did not live at the house in November 2018, but instead lived with the mother of his children in a house they purchased in Oswego. Aleeya's grandmother had a stroke, so defendant helped financially.

¶ 85    On November 7, 2018, Aleeya left her room to see who was banging on the front door. She saw Terrell sitting at the table handcuffed with some officers standing around him. The officers told Aleeya to sit at the table and then started searching the house.

¶ 86    Aleeya testified that she recognized People's exhibit No. 12, a citation for defendant, because she saw it in the mail and put it in defendant's room for him a few months before the search warrant was executed. She had never seen a gun in defendant's room.

¶ 87    Luisa Aguilar testified that she is defense counsel's paralegal and the mother of defendant's children. Aguilar acknowledged that she worked on this case in her capacity as a paralegal. In November 2018, defendant's belongings were at their house in Oswego. Aguilar said that there were no threats against her family or any other safety concerns for defendant or their family. Aguilar also stated that she has a FOID card but does not own a gun.

¶ 88    Following Aguilar's testimony, defense counsel read a stipulation, defense exhibit No. 40, into the record. The parties stipulated that if Investigator Griffin of the Aurora Police Department were called to testify, he would say that when defendant was arrested, he had a wallet containing a state identification card, five credit cards, and $1403 in United States currency. The defense then rested.

¶ 89    During deliberations, the jury sent out a note asking, "1.) What is the Galena Ave Aurora address?; 2.) Can we find guilt per gun?; 3.) What is 3 super x's, class 2 + class 3? in conversation on phone (line 106 on phone call); 4.) What gun did Terrell take a plea to? and was it one of the 7?" The court responded, "1.) The evidence is closed. I cannot give you any more evidentiary information; 2.) Yes. The jury can find the defendant guilty or not guilty on each charge on each gun; 3.) The meaning of those terms is not admissible evidence; 4.) Terrell Alvarez pleaded guilty to one of the guns admitted into evidence in this trial."

¶ 90    The jury ultimately found defendant guilty on all 14 counts. Defendant filed a motion for a new trial, which was denied. The court sentenced defendant to 10 years' imprisonment on each of counts IV through X and 5 years' imprisonment on each of counts XIV through XX, all to be served concurrently and at 50%. This appeal ensued.

¶ 91                                II. ANALYSIS

¶ 92                              A. Motion to Suppress

¶ 93    Defendant first argues that the trial court erred in denying his motion to suppress evidence because the search of the Solfisburg Property violated his rights under the fourth amendment. U.S. Const., amend. IV; see also Ill. Const. 1970, art. I, § 6. Specifically, defendant claims that the firearms at issue in this case were discovered as a result of an illegal search of the bedroom he was renting at the Solfisburg Property during a parole compliance check on his brother, Terrell.

Defendant acknowledges that Terrell was residing at the Solfisburg Property at the time of the search and that, as a parolee who signed an MSR agreement, Terrell had a "greatly diminished expectation of privacy." Nevertheless, defendant argues that Terrell's status as a parolee did not automatically grant parole agents the right to search the entire home. Defendant also argues that the search of the Solfisburg Property violated the Department's operating procedural manual pertaining to searches of offenders.

¶ 94 The State responds that the trial court properly denied defendant's motion to suppress evidence because a parole agent observed a firearm in plain view during a parole compliance check of a person who resided at the Solfisburg Property and who, at times, slept in the room in which the firearms were located. This, in turn, led the police to obtain a valid search warrant. The State contends that even if the search warrant was not valid, the police had a right to rely on the warrant under the good-faith exception to the exclusionary rule.

¶ 95 In reviewing a trial court's ruling on a motion to suppress evidence, we employ a two-part standard. *People v. Tennort*, 2023 IL App (2d) 220313, ¶ 15. Under this standard, we defer to the trial court's findings of fact and credibility determinations and will reverse those findings only if they are against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006); *People v. Mora*, 2023 IL App (2d) 210653, ¶ 40. Findings of fact are against the manifest weight of the evidence only when an opposite conclusion is clearly evident from the record or if the finding is unreasonable, arbitrary, or not based on the evidence. *People v. Pursley*, 2022 IL App (2d) 210558, ¶ 60. However, we review *de novo* the trial court's ultimate legal ruling on whether the evidence should be suppressed. *People v. Almond*, 2015 IL 113817, ¶ 55. Moreover, in reviewing a pretrial suppression hearing, a court may rely on evidence presented at defendant's

trial, as well as at the suppression hearing. *Almond*, 2015 IL 113817, ¶ 55; *People v. Kidd*, 175 Ill. 2d 1, 25 (1996).

¶ 96     The fourth amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. The fourth amendment is applicable to the states through the fourteenth amendment (U.S. Const., amend. XIV). *People v. James*, 163 Ill. 2d 302, 311 ("The principles of the fourth amendment are applicable to the States through the due process clause of the fourteenth amendment"). Our supreme court has explained that "[t]he essential purpose of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions." (Internal quotation marks omitted.) *People v. Colyar*, 2013 IL 111835, ¶ 31; see also *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (observing that "the ultimate touchstone of the Fourth Amendment is 'reasonableness' "). Reasonableness is measured in objective terms by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *People v. Wilson*, 228 Ill. 2d 35, 40 (2008); *People v. Moss*, 217 Ill. 2d 511, 518 (2005). "A search conducted without prior approval of a judge or magistrate is *per se* unreasonable under the fourth amendment, subject only to a few specific and well-defined exceptions." *People v. Bridgewater*, 235 Ill. 2d 85, 93 (2009). One of these exceptions concerns parolees. Illinois courts have held that a parolee who has signed an MSR agreement that has a consent-to-search provision has a greatly diminished expectation of privacy in his or residence such that standard fourth amendment protections do not apply. *Wilson*, 228 Ill. 2d at 52; *People v. Johnson*, 2020 IL App (1st) 172987, ¶¶ 35-39; *People v. Coleman*, 2013 IL App (1st) 130030, ¶ 12.

¶ 97    Here, in denying defendant's motion to suppress, the trial court found that Terrell was a resident of the Solfisburg Property and upon his release from the Department, he "gave his consent to a search of his person, property or residence under his control." The court reasoned that "any area of the Solfisburg [Property] was under control of Terrell *** if he had access." The court found that the Department's parole agents "had authority to walk through all accessible areas of the Solfisburg [Property] for safety reasons, and to discover any violations of the parolee, Terrell." The court concluded that when Samuelson observed contraband in the middle bedroom of the Solfisburg Property, she "was in a position she had a legal right to be and made a legal observation of possible contraband in an area accessible to the parolee." The court reasoned that limiting access on a parole-compliance check to the areas a parolee indicates were under his or her control "would undermine the efficacy of the search." Because the search administered in conjunction with the parole-compliance check was limited to areas to which Terrell had access or control, the court concluded that the search did not violate defendant's fourth amendment rights.

¶ 98    At the outset, we note that it was Terrell—not defendant—who was the subject of the parole-compliance check on November 7, 2018. With his in mind, we examine defendant's arguments.

¶ 99    As noted above, our supreme court has recognized that parolees such as Terrell who have signed an MSR agreement have a reduced expectation of privacy such that the standard fourth amendment protections do not apply to them. *Wilson*, 228 Ill. 2d at 52. In *Wilson*, parole agents and police officers visited the defendant's residence after receiving a tip that the defendant, who was a parolee, had possession of drugs and weapons. *Wilson*, 228 Ill. 2d at 38. At the time, the defendant was subject to an MSR agreement which contained a consent-to-search provision. *Wilson*, 228 Ill. 2d at 37. The defendant's relative gave law enforcement permission to enter the

residence. *Wilson*, 228 Ill. 2d at 38. Once inside, defendant was observed exiting a room that he said was his bedroom. *Wilson*, 228 Ill. 2d at 38. The police searched the room from which the defendant emerged and found drugs. *Wilson*, 228 Ill. 2d at 38. A parole agent testified that he believed he did not need a warrant or consent to search the defendant's bedroom because the "defendant's MSR agreement constituted [the] defendant's consent to any searches of his person, property, or residence." *Wilson*, 228 Ill. 2d at 38-39. The defendant moved to suppress evidence on the basis that the search of his bedroom violated his rights under the fourth amendment. *Wilson*, 228 Ill. 2d at 37. The trial court denied the motion, "finding that [the] defendant consented to the search when he signed the MSR agreement." *Wilson*, 228 Ill. 2d at 39.

¶ 100    The Illinois Supreme Court affirmed the trial court's denial of the defendant's motion to suppress evidence. *Wilson*, 228 Ill. 2d at 52. The supreme court acknowledged that the search of the defendant's room was nonconsensual, stating: "[The police officers] did not ask for consent before ordering the search of [the] defendant's bedroom. Moreover, [the] defendant's search condition, which mandates that he 'shall consent to a search,' did not constitute prospective consent." *Wilson*, 228 Ill. 2d at 39. Nevertheless, the supreme court noted that parolees remain in the legal custody of the Department for the duration of their parole and that the search condition contained in the MSR agreement puts parolees on notice that law enforcement officials may search their person, property, or residence at any time, with or without reasonable suspicion. *Wilson*, 228 Ill. 2d at 48-50.

¶ 101    In its holding, the supreme court focused on parolees' diminished expectation of privacy and the "salient government interest in preventing recidivism and protecting society from future crimes." *Wilson*, 228 Ill. 2d at 41. The court stated: "[W]e find that any 'special protection' afforded to [the] defendant's residence was lost when he became a parolee and agreed [in his MSR

agreement] to consent to a search of his residence." *Wilson*, 228 Ill. 2d at 52. Citing to *Samson v. California*, 547 U.S. 843, 856-57 (2006), the court explained that if searches of parolees required suspicion, parolees would have a greater opportunity to anticipate searches and conceal criminality, which would undermine the government's ability to effectively supervise parolees. *Wilson*, 228 Ill. 2d at 45-46. The Illinois Supreme Court confirmed that the fourth amendment does not prohibit a police officer from conducting a suspicionless search of a parolee, his or her property, or his or her residence. *Wilson*, 228 Ill. 2d at 52.

¶ 102   In another parole compliance search case, the reviewing court in *Johnson*, 2020 IL App (1st) 172987, relied on *Wilson* to affirm the trial court's denial of the defendant's motion to suppress. In that case, the defendant was charged with various gun and narcotic offenses. *Johnson*, 2020 IL App (1st) 172987, ¶ 3. At the time, the defendant was on parole and subject to an MSR agreement with a consent-to-search provision. *Johnson*, 2020 IL App (1st) 172987, ¶ 3. Prior to trial, the defendant moved to suppress, on fourth amendment grounds, the weapons and drugs recovered from the residence where he was arrested. *Johnson*, 2020 IL App (1st) 172987, ¶ 4.

¶ 103   At the suppression hearing, parole agent Tina Williams testified that she, two other parole agents, and several police officers went to a home to perform a parole compliance check of the defendant. *Johnson*, 2020 IL App (1st) 172987, ¶ 5. When Williams knocked on the front door, no one answered, so Williams called the defendant's cell phone. *Johnson*, 2020 IL App (1st) 172987, ¶ 11. The defendant answered his cell phone and said that he would be right down, but took six minutes to open the front door. *Johnson*, 2020 IL App (1st) 172987, ¶ 11. Williams explained that the purpose of the compliance check was to determine if the defendant was complying with his parole, including verifying that he actually lived at the residence by " 'looking for' 'first class mail' and 'property that belonged' to the defendant." *Johnson*, 2020 IL App (1st) 172987, ¶¶ 5-6.

To that end, Williams asked the defendant if he had any mail to show her. *Johnson*, 2020 IL App (1st) 172987, ¶ 6. The defendant responded that he had some and he looked "in a room that was not his room," but he could not find it. *Johnson*, 2020 IL App (1st) 172987, ¶ 6. The defendant then took the parole agents into a bedroom that contained "female belongings." *Johnson*, 2020 IL App (1st) ¶ 7. The parole agents searched the room, but did not find any mail addressed to the defendant. *Johnson*, 2020 IL App (1st), ¶ 7. When Williams asked the defendant which room was his, he insisted that it was the room with the female belongings. *Johnson*, 2020 IL App (1st), ¶ 7. Williams told the defendant that she did not believe him because none of his belongings were found in that room. *Johnson*, 2020 IL App (1st), ¶ 8. Williams then asked the defendant's uncle (who was letting the defendant stay in his home) to identify which bedroom was the defendant's. *Johnson*, 2020 IL App (1st) 172987, ¶ 8. The uncle directed Williams to a locked bedroom. *Johnson*, 2020 IL App (1st) 172987, ¶ 8. A police officer broke the lock, opened the door, and entered. *Johnson*, 2020 IL App (1st) 172987, ¶ 9. Inside, the police found a gun, ammunition, and drugs. *Johnson*, 2020 IL App (1st) 172987, ¶ 9. Williams acknowledged that she did not have a warrant to search the residence. *Johnson*, 2020 IL App (1st) 172987, ¶ 10. The defendant testified at the suppression hearing that he slept on the couch and that his belongings were kept in a room referred to as "the storage room." *Johnson*, 2020 IL App (1st) 172987, ¶ 14. The defendant acknowledged that his ID, a piece of mail, his cell phone, and a pair of his pants were found in the bedroom where the weapons and drugs were recovered, but insisted that that room was not his. *Johnson*, 2020 IL App (1st) 172987, ¶¶ 13-14.

¶ 104    The trial court denied the motion to suppress. *Johnson*, 2020 IL App (1st) 172987, ¶ 16. The court determined that parolees "are in a totally different situation as far as [f]ourth [a]mendment claims are concerned" and that they "do not have the same rights under the [f]ourth

[a]mendment to assert such claims than defendants who are not on parole." *Johnson*, 2020 IL App (1st) 172987, ¶ 16. Following a bench trial, the defendant was found guilty of various weapon- and drug-related offenses. *Johnson*, 2020 IL App (1st) 172987, ¶¶ 17-23.

¶ 105   The defendant appealed, arguing, *inter alia*, that the trial court erred in denying his motion to suppress evidence because the search of his residence violated his rights under the fourth amendment. *Johnson*, 2020 IL App (1st) 172987, ¶ 31. Specifically, he argued that he had a reasonable expectation of privacy in the locked bedroom that the police entered by breaking the lock without his consent. *Johnson*, 2020 IL App (1st) 172987, ¶ 31. The defendant acknowledged that parolees have a diminished expectation of privacy, but argued that this expectation of privacy is not extinguished entirely. *Johnson*, 2020 IL App (1st) 172987, ¶ 31. The defendant also claimed that the MSR agreement, while requiring him to consent to searches, did not constitute his consent to all prospective searches. *Johnson*, 2020 IL App (1st) 172987, ¶ 31.

¶ 106   Relying on *Wilson*, 228 Ill. 2d 35, the *Johnson* court rejected the defendant's arguments and held that the trial court did not err in denying the defendant's motion to suppress. *Johnson*, 2020 IL App (1st) 172987, ¶¶ 32-39. The court determined that as a parolee out on MSR at the time of the search, the defendant was not afforded the usual protections from warrantless and suspicionless searches. *Johnson*, 2020 IL App (1st) 172987, ¶ 38. The court found irrelevant the fact that neither the defendant nor anyone else in the residence consented to the search. *Johnson*, 2020 IL App (1st) 172987, ¶ 39. The court noted that the defendant signed an MSR agreement that put him on notice that his residence could be searched at any time. *Johnson*, 2020 IL App (1st) 172987, ¶ 39. Moreover, although the defendant denied it, circumstantial evidence established that the locked bedroom was the defendant's room and thereby under his control. *Johnson*, 2020 IL App (1st) 172987, ¶ 39. In this regard, the court observed that the defendant talked to Williams on

a cell phone shortly after arriving at the residence. *Johnson*, 2020 IL App (1st) 172987, ¶ 39. That cell phone was then found in the pocket of his pants inside the locked bedroom. *Johnson*, 2020 IL App (1st) 172987, ¶ 39. Moreover, the defendant's mail, ID, and Social Security card were found inside the room, the defendant's uncle identified the locked bedroom as the defendant's room, and the police officers did not find any of the defendant's belongings elsewhere in the residence. *Johnson*, 2020 IL App (1st) 172987, ¶ 39. As such, the court concluded that the totality of the circumstantial evidence established that the locked bedroom was the defendant's and the weapon, ammunition, and drugs found therein were properly ascribed to him. *Johnson*, 2020 IL App (1st) 172987, ¶ 39.

¶ 107   Turning to the facts in this case and examining the totality of the circumstances, we conclude that the trial court did not err in denying defendant's motion to suppress evidence. At the outset, we note that when Terrell was released on parole, he was subject to an MSR agreement. Terrell therefore had a reduced expectation of privacy such that the standard fourth amendment protections do not apply to him. *Wilson*, 228 Ill. 2d at 52 (noting that a parolee's reduced expectation of privacy is further diminished by his or her acceptance of the clear and unambiguous terms of the search condition contained in the parole agreement); *Johnson*, 2020 IL App (1st) 172987, ¶¶ 38-39 (same). Further, the MSR agreement included a consent-to-search provision, which stated that Terrell "shall consent to a search of [his] person, property, or residence under [his] control." Thus, Terrell was on notice that his residence could be searched at any time. *Wilson*, 228 Ill. 2d at 48-50; *Johnson*, 2020 IL App (1st) 172987, ¶ 39.

¶ 108   Moreover, based on their interactions with Terrell, the parole agents possessed reasonable, articulable cause to believe that he did not sleep on the couch in the living room or the bedroom he indicated. First, during the November 7, 2018, parole check, Terrell appeared nervous and he

was shaking and sweating. Second, Terrell provided answers to the parole agents' questions that did not seem truthful. Terrell initially told the parole agents that he slept on the living room couch and kept his belongings in one of the back bedrooms. However, the parole agents found only a hoodie, a pair of pants, a pair of shoes, and a gold chain in the living room. Further, the parole agents did not find any possessions that they could identify as belonging to Terrell in the back bedroom. In fact, one of the parole agents described the back bedroom as a girl's room. When confronted with these findings, Terrell disclaimed having any other belongings such as clothes, shoes, a wallet, or a cell phone. Terrell's responses rightfully concerned the parole agents. Terrell had been paroled to the Solfisburg Property in July 2018. Yet, according to what Terrell represented, he possessed only the clothes he was wearing, two additional articles of clothing, a pair of shoes, and a gold chain. Terrell's responses were not consistent with him having lived at the Solfisburg Property for the three-month plus period between the time he was released on parole and the parole compliance check in November 2018.

¶ 109   It was Terrell's vague and inconsistent responses to the parole agents' inquiries that led them to question whether he was actually living in the Solfisburg Property, and if so, where. Samuelson directed her attention to the south middle bedroom, which was adjacent to the living room. There were two doors separating that bedroom from the living room. Samuelson testified that both doors were open. While standing in the hallway, and with the use of a flashlight, Samuelson observed, in plain view, the butt of a gun on a dresser past the open bedroom door. See *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (noting that the plain view doctrine applies when law enforcement is "lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant"). Samuelson then noticed additional firearms in

the bedroom. Thereafter, the parole agents contacted the Aurora police and a search warrant was obtained. These actions were reasonable given the totality of the circumstances.

¶ 110    Additionally, as in *Johnson*, there was other direct and circumstantial evidence establishing that the south middle bedroom (also referred to as "defendant's bedroom") was accessible to, and under the control of, Terrell. Vargas acknowledged that when Terrell was paroled to the Solfisburg Property in July 2018, he had the ability to move around the house and enter its various rooms, including the south middle bedroom. Following execution of the search warrant, the police found in the south middle bedroom shoes of Terrell's size and a social security card in Terrell's name. No other items belonging to Terrell were identified in the house save the few items located in the living room. The totality of this evidence establishes that Terrell had access to and control over the south middle bedroom. Consequently, we conclude that the trial court's finding that Terrell had access to or control over the south middle bedroom was not against the manifest weight of the evidence. Thus, the firearms and the drugs found inside the south middle bedroom were legally seized and the trial court did not err in denying defendant's motion to suppress the evidence found therein.

¶ 111    Defendant contends that upholding the trial court's decision would "rest[] on an untenable holding that the [f]ourth [a]mendment does not apply to any property where a parolee resides because the parolee may be lying about what areas he can access." We disagree. As noted above, the parole agents had reasonable, articulable cause to disbelieve Terrell's claims as to where he stayed within the residence. First, as noted above, Terrell's demeanor supported the parole agents' disbelief. Terrell appeared nervous and he was shaking and sweating. Second, and more significant, Terrell's responses to the parole agents' inquiries regarding where he slept and kept his belongings were inconsistent with the facts. The only personal items that were found near the

couch where Terrell claimed to sleep was a hoodie, a pair of pants, a pair of shoes, and a gold chain. The bedroom he claimed to keep his things in appeared be a girl's room, with no sign of Terrell's belongings. Terrell's demeanor and the fact that he had few possessions in the areas where he directed the parole agents supported their disbelief. The parole officer had authority to search defendant's residence; their focus was directed to which bedroom was his. Defendant complains that all a parole agent has to do then is to testify that the parolee lied. We disagree. If the parole agent's testimony is not supported by reasonable, articulable, and relevant evidence, it will not survive a challenge. If the defendant's answers are inconsistent with the observed facts, the parole agent is not required to believe the parolee.

¶ 112    Defendant also insists that the parole agents violated the policies contained in the Manual when they conducted the parole compliance checks. According to defendant, the Manual makes clear that it is not the Department's policy "to simply walk into a parolee's residence, decide they do not believe the parolee, then search the entire house with no respect for the other residents." Instead, he asserts, parole agents are to ask for consent from the host and/or parolee before conducting a search. If permission is denied, the agent is not automatically given the authority to proceed with a search. Instead, he or she is required to consult with a superior about the appropriate next steps. If the matter is escalated, parole agents are still not instructed to simply proceed with a search, but are supposed to contact local law enforcement to obtain a search warrant. We observe, however, that the parole agents testified that they followed the standard protocol for parole compliance checks. Moreover, they testified that the protective searches section of the Manual did not apply to parole compliance checks. In any event, defendant does not cite any authority for the proposition that the failure to follow the procedures outlined in the Manual render a search unconstitutional under the fourth amendment. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (providing

that where a party does not offer any argument or meaningful authority in support of that argument, the argument is forfeited); *People v. Brennan*, 2023 IL App (2d) 220190, ¶ 44.

¶ 113  Lastly, defendant argues that if parole agents have some reason to suspect that a parolee is lying, they have multiple options that do not involve violating the fourth amendment. For instance, they may contact local law enforcement to pursue a search warrant or they may take steps to revoke the individual's parole based on non-compliance. Defendant cites *Moss*, 217 Ill. 2d at 524 and *Wilson*, 228 Ill. 2d at 49, in support of this argument. However, in both of those cases, the supreme court upheld warrantless searches. *Wilson*, 228 Ill. 2d at 47-52 (holding that no reasonable suspicion was required for a warrantless search of the defendant's bedroom in light of the defendant's status as a parolee and the plain language of the search condition of his MSR agreement); *Moss*, 217 Ill. 2d at 534 (finding warrantless pat-down search of the defendant was constitutionally reasonable in light of objective officer safety concerns and the defendant's status as a parolee subject to a search condition). Thus, we fail to see the import of these cases.

¶ 114                                B. Evidentiary Ruling

¶ 115  Next, defendant argues that the trial court abused its discretion when it barred him from inquiring at trial about three areas of evidence related to Terrell's history of possessing firearms. Defendant argues that the trial court's rulings impeded his ability to put on an effective defense. The State responds that defendant forfeited one of these claims. The State further contends that the trial court did not otherwise abuse its discretion in prohibiting him from eliciting evidence that Terrell had an alleged history of possessing firearms because such evidence was not relevant to any issue in the case or it constituted inadmissible hearsay.

¶ 116  At the outset, we address the appropriate standard of review. As noted above, defendant argues that the trial court "abused its discretion" when it barred him from presenting certain

evidence. In discussing the standard of review, defendant also recognizes that, generally, a trial court's evidentiary rulings are reviewed for an abuse of discretion. See *People v. Hall*, 195 Ill. 2d 1, 20-21 (2000); *People v. Reid*, 179 Ill. 2d 297, 313 (1997); *People v. Dunmore*, 389 Ill. App. 3d 1095, 1104 (2009). Nevertheless, he urges us to review the trial court's rulings *de novo* because they "violated [his] due process right to present his defense." In support of his position, defendant relies on *People v. Burns*, 209 Ill. 2d 551 (2004). While it is true that *Burns* stated that the "standard of review for determining whether an individual's constitutional rights have been violated is *de novo*" (*Burns*, 209 Ill. 2d at 560), that was in the context of addressing whether a respondent seeking discharge from commitment is entitled to an independent psychiatric evaluation as a matter of due process. Here, defendant's constitutional claim is based on allegedly erroneous evidentiary rulings. Therefore, we will review the trial court's rulings for an abuse of discretion. *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 104 (applying abuse of discretion standard in addressing the defendant's claim that the trial court's exclusion of certain evidence deprived him of his right to present a complete defense); *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133 ("[W]hen a party claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, the standard of review is abuse of discretion."); *People v. Schneider*, 375 Ill. App. 3d 734, 751 (2007) (noting that while a defendant has the right to present a defense, a trial court has broad discretion in ruling on evidence sought to be excluded). A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the view adopted by the trial court. *McCullough*, 2015 IL App (2d) 121364, ¶ 104. Reversal is not appropriate under the abuse-of-discretion standard where reasonable minds can

disagree about whether certain evidence is admissible. *People v. Foreman*, 2019 IL App (3d) 160334, ¶ 30.[1]

¶ 117 According to defendant, the primary issue at trial was to determine whether he and Terrell jointly possessed the firearms found by parole agents or whether Terrell possessed the firearms on his own, without defendant's involvement. As such, defendant asserts that "[i]t was *** critical that the jury hear evidence about why it was far more likely that Terrell himself possessed the firearms than it was that [defendant] too possessed those same firearms." Nevertheless, defendant contends, the trial court barred him from presenting evidence that: (1) the reason Aurora Police requested the parole search on November 7, 2018, at the Solfisburg Property was because they had reason to believe Terrell, while still on parole, participated in the recent shooting of a police officer; (2) Terrell had a significant history of illegally obtaining, possessing, and using guns; and (3) Terrell made statements to police after his arrest about parole agents going into "his" room and finding the contraband. Defendant contends that the trial court's evidentiary rulings deprived him of his constitutional right to present a complete defense because all this evidence "might tend to create doubt as to his guilt." See *People v. Mikel*, 73 Ill. App. 3d 21, 30 (1979). We address *seriatim* each area of evidence that defendant argues was improperly barred.

¶ 118                                    1. Parole Search Request

¶ 119 Defendant first claims that the trial court improperly barred him from presenting evidence that the Aurora Police requested the parole search of the Solfisburg Property on November 7, 2018, because they had reason to believe that Terrell, while still on parole, participated in the recent

---

[1] Although we apply an abuse-of-discretion standard, regardless of the standard of review applied, our conclusion would be the same.

shooting of a police officer. The State responds that defendant has forfeited this claim of error because (1) he did not raise it in his motion for a new trial and (2) there is nothing in the record to support defendant's claim that he was prevented from eliciting testimony that Terrell was allegedly a suspect in a police shooting. We agree that defendant had forfeited review of this claim.

¶ 120   It is well settled that to preserve an issue on appeal, a defendant must both object to the purported error at trial and include it in a written posttrial motion. *People v. Glasper*, 234 Ill. 2d 173, 203 (2009); *People v. Williams*, 2022 IL App (2d) 200455, ¶ 85. This rule exists to encourage a defendant to raise an issue in the trial court, thereby ensuring both that the trial court has an opportunity to correct any errors prior to appeal and that a defendant does not obtain reversal through his or her own inaction. *People v. Denson*, 2014 IL 116231, ¶ 13; *Williams*, 2022 IL App (2d) 200455, ¶ 85. As the State correctly notes defendant failed to raise this issue in his motion for a new trial. In his reply brief, defendant does not dispute that he did not raise this claim in a written posttrial motion. Consequently, defendant has forfeited review of this claim. *Schneider*, 375 Ill. App. 3d at 751 (holding that defense counsel's failure to raise issue in posttrial motion resulted in its forfeiture on appeal).

¶ 121   Additionally, as we explain below, this claim has been forfeited for an entirely independent reason. The trial court never barred defendant from presenting evidence that the Aurora Police requested the parole search of the Solfisburg Property on November 7, 2018, because it had reason to believe that Terrell, while still on parole, participated in the recent shooting of a police officer. The record shows that on May 6, 2022, outside of the presence of the jury, the trial court asked defense counsel if she had a witness. Defense counsel responded that she had "a witness that's not here from the Aurora Police Department." The State subsequently identified the prospective witness as a Sergeant Tate. Defense counsel then explained that Tate suspected that Terrell was

involved in the shooting of a police officer, so Tate "contacted the Department" and requested that it conduct a parole compliance check on Terrell. The State responded that Tate's testimony would not be relevant "to the possession in *** this case." Defense counsel then proffered reasons she believed the testimony was relevant. Defense counsel reiterated that Tate's belief that Terrell was involved in a recent crime involving a gun prompted the parole compliance check. Defense counsel elaborated that her "whole defense is these guns belong to Terrell" and that she "should be able to inquire about how the investigation started and that [the police] anticipated that Terrell *** had guns and they do a search and they find guns." The trial court called the jury into the courtroom without ruling.

¶ 122   Defense counsel then called other witnesses. After the jury was released for the day, the trial court inquired about the witnesses defendant intended to call at the next court date. Defense counsel stated that she planned to call three police officers, including Tate. Defense counsel explained that the relevance of Tate's anticipated testimony was that Tate "expected to find Terrell *** in possession of guns." Defense counsel asserted that Terrell was a suspect in crimes against police officers and that the police had information about a gun used in that offense. Therefore, defense counsel wanted to ask Tate "when he contacted [the Department] and asked for the parole compliance check, what it was he was expecting to find." In response, the court stated, "[s]o the idea would be that's relevant because this information had [Terrell] in possession of a weapon and, therefore, those weapons would be his?" Defense counsel responded in the affirmative. The State objected to Tate being called as a witness, arguing that none of the reasons cited by defense counsel for calling Tate were relevant to the issues in the case. The trial court reserved ruling on the State's objection until the next court date, Monday, May 9, 2022.

¶ 123   At the next court date, the trial court asked, prior to the jury being seated, if there was anything it needed to address. Defense counsel responded in the affirmative and told the court that she and the State "are printing out a stipulation." The trial court then asked defense counsel if she had other witnesses to call. Defense counsel inquired if she could "check and see if [her] last witness is in the hall yet." Defense counsel then called Aguilar to the stand. Following Aguilar's testimony, the court asked defense counsel if she had another "live witness" to call. Defense counsel responded in the negative. After the parties' stipulation was entered into evidence and read to the jury, defendant rested his case.

¶ 124   As the foregoing establishes, there is nothing in the record to support defendant's claim that he was prevented from eliciting testimony that Terrell was allegedly a suspect in a police shooting. When trial recommenced on May 9, 2022, the trial court did not rule on the State's objection to Tate's testimony, defense counsel did not ask the court to rule on the objection, and defense counsel did not ask to call Tate to testify. In fact, defense counsel did not mention Tate at all despite the trial court asking her if there was anything it needed to address and inquiring on two separate occasions if she had any other witnesses to call. This provides a separate, independent basis for forfeiture. See *People v. Hall*, 114 Ill. 2d 376, 413-14 (1986) (holding that alleged error was waived where the trial court did not rule on the defendant's objection, ordering a recess instead, and the defendant did not pursue the objection when the proceeding reconvened); *People v. Caballero*, 102 Ill. 2d 23, 38 (1984) (holding that the defendant failed to preserve issue for review where the trial court did not rule on objection and the defendant did not request a ruling or call the judge's attention to the fact that no ruling had been made); *People v. Waller*, 67 Ill. 2d 381, 386 (1977) (holding that party's failure to request ruling on the admissibility of certain evidence resulted in waiver); *People v. Rossi*, 52 Ill. 2d 13, 17 (1972) (noting that the failure of a trial court

rule on a matter "is not open to review at the instance of one who failed to request a ruling when the court did not make one, or in some other manner pointed out to the trial judge his failure to act"); *In re Estate of Walter*, 2023 IL App (1st) 211600, ¶ 52 (holding that party forfeited review of issue where she failed to obtain a ruling on a motion, the matter proceeded to trial, and the party did not file a posttrial motion addressing the issue); *People v. Clankie*, 180 Ill. App. 3d 726, 731 (1989) (noting that a defendant has the responsibility for obtaining rulings on his motions and his failure to do so constitutes a waiver of those issues on review). In his reply brief, defendant acknowledges that the trial court did not explicitly prevent defense counsel from calling Tate to testify about the origins of the parole compliance check. Nevertheless, he insists that the court's statements in response to defense counsel's arguments made it clear that the court would not allow that line of inquiry. We disagree. Had the trial court been wholly unsympathetic to defendant's position, it would have sustained the State's objection immediately instead of reserving its ruling. As such, defendant's argument is unpersuasive.

¶ 125                    2. History of Possessing Firearms

¶ 126   Defendant next claims that the trial court improperly barred him from presenting evidence that Terrell had a significant history of illegally obtaining, possessing, and using guns. The State responds that there was no error as the evidence was not relevant to whether Terrell and defendant jointly possessed the firearms. We agree with the State.

¶ 127   Prior to the defense presenting its case, and based on comments made by defense counsel in her opening statement, the State requested that defendant be barred from eliciting from Terrell (defendant's own witness) character evidence in the form of prior crimes, arrests, police reports, and convictions related to firearms. Defense counsel responded that "the whole issue for the jury in this case is *** who possessed these guns." Defense counsel stated that she intended to call

Terrell "to talk about the fact that he has historically owned and possessed guns." Defense counsel classified this as a *modus operandi* argument. She denied that it was character evidence, explaining:

"It's not for his character. I'm not trying to impeach him. I'm trying to show that logically he is the owner of the guns, that he typically owns guns and in the past he has consistently owned guns and been caught by the police with guns.

You would be gutting my whole case if I can't get into the fact that [Terrell] is logically the person who *** possessed these guns."

Defense counsel added that Terrell has a "lockout statement, so he's prevented from answering other questions that I would have otherwise liked to get into but I can't." The State responded that the "lockout statement in no way bars" defense counsel from asking Terrell if he possessed the guns in question, about his guilty plea to possessing one of the guns, or about the dismissal of other counts filed against him. The trial court granted the State's request, finding that Terrell's prior possession of weapons was inadmissible character evidence.

¶ 128 Defense counsel later renewed her request to ask Terrell about his prior gun arrests "to show that he [had] a history of illegally possessing firearms." Defense counsel proffered that Terrell was convicted of and on parole for a 2016 possession of heroin offense. As part of the 2016 case, Terrell was also charged with possession of a firearm, a charge that was dismissed as part of a negotiated plea. Also dismissed as part of the 2016 plea was a charge that Terrell threatened a police officer by telling him that he was going to shoot him with vest-piercing bullets. Defense counsel further asserted that Terrell was convicted in 2016 of disorderly conduct for discharging a firearm in Aurora and, in 2010, he was arrested for unlawful possession of a replica firearm. Defense counsel argued that Terrell's history of possessing guns is relevant because "the jury is

going to have to determine if Terrell *** possessed these guns, if [defendant] possessed guns, or if they possessed them together." The trial court again denied defense counsel's request to elicit the testimony as improper character evidence under Illinois Rule of Evidence 404 (Ill. R. Evid. 404 (eff. Jan. 1, 2011)). The court stated that the proffered evidence qualifies as "character evidence" because it constitutes "specific information about this particular person in order to prove conformity with conduct in this charged offense."

¶ 129   Defendant contends that the trial court erroneously barred him from inquiring about Terrell's "significant history of illegally obtaining, possessing, and using guns" because this line of inquiry was relevant to show that Terrell "had the intent, motive, and knowledge to obtain, possess, and use the illegal firearms that parole officers found in this case."  The State initially responds that defendant forfeited this argument because he never made the argument before the trial court. The State further responds that this evidence was not relevant to whether Terrell solely possessed the firearms at issue.

¶ 130   We disagree with the State's forfeiture claim. In the trial court, defense counsel explicitly sought to introduce Terrell's history with guns as evidence. Although, defense counsel sought to introduce this evidence on a different basis than defendant raises on appeal (*modus operandi* versus knowledge, intent, lack of mistake, and motive), a party is only required to preserve an issue or claim for appeal and they are not required to limit their arguments to the same arguments made at trial. *Brunton v. Kruger*, 2015 IL 117663, ¶ 76. Thus, we conclude that the issue related to the admissibility of Terrell's history of firearms possession has been preserved.

¶ 131   Although a criminal defendant is constitutionally guaranteed a meaningful opportunity to present a complete defense (*Burgess*, 2015 IL App (1st) 130657, ¶ 133), the evidence must be relevant and material to be admissible (*Schneider*, 375 Ill. App. 3d at 751-52; *Mikel*, 73 Ill. App.

3d at 30; see also Ill. R. Evid. 402 (eff. Jan. 1, 2011)). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011); *Schneider*, 375 Ill. App. 3d at 752; *People v. Buck*, 361 Ill. App. 3d 923, 938 (2005). "The court must ask whether the proffered evidence fairly tends to prove or disprove the offense charged and whether that evidence is relevant in that it tends to make the question of guilt more or less probable." *People v. Hill*, 2014 IL App (2d) 120506, ¶ 50. If the proffered evidence is remote, uncertain, or speculative, the trial court in its discretion may properly reject it. *Schneider*, 375 Ill. App. 3d at 752.

¶ 132    Additionally, evidence of a person's character or a trait of character is generally not admissible for the purpose of proving action in conformity therewith on a particular occasion. Ill. R. Evid. 404(a) (eff. Jan. 1, 2011). Similarly, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith except as allowed by certain statutory exceptions not relevant here or for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Even if other-crimes evidence is offered for a permissible purpose, however, it will be disallowed where its prejudicial impact substantially outweighs its probative value. *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 97.

¶ 133    We conclude that the trial court did not abuse its discretion in barring defendant from presenting evidence of Terrell's history of firearm possession. According to defendant, the primary issue at trial was to determine whether he and Terrell jointly possessed the firearms found by parole agents or whether Terrell possessed the firearms on his own, without defendant's involvement. As such, defendant asserts that "[i]t was *** critical that the jury hear evidence about why it was far

more likely that Terrell himself possessed the firearms than it was that [defendant] too possessed those same firearms." We note that the jury was instructed on joint possession. That instruction provided that "[i]f two or more persons share the immediate and exclusive control or share the intention and the power to exercise control over a thing, then each person has possession." The jury also heard Terrell's testimony that he pleaded guilty to one of the firearms recovered in this case. However, defendant does not explain, nor is it clear to us, how Terrell's previous history with firearms makes the proposition of defendant's joint possession of the weapons less likely. Indeed, both our supreme court and this court have recognized that possession by one defendant does not exonerate any other defendant. *People v. Givens*, 237 Ill. 2d 311, 338 (2010) (quoting *People v. Ingram*, 389 Ill. App. 3d 897, 901 (2009)) ("The law is clear that the exclusive dominion and control required to establish constructive possession is not diminished by evidence of other's access to the contraband. [Citation.] When the relationship of others to the contraband is sufficiently close to constitute possession, the result is not vindication of the defendant, but rather a situation of *joint* possession." Internal quotation marks omitted.).

¶ 134   In support of his position, defendant directs us to *People v. Sims*, 2019 IL App (3d) 170417. In that case, the defendant was charged with unlawful possession of a weapon by a felon after the police found a .380-caliber handgun in his car. *Sims*, 2019 IL App (3d) 170417, ¶ 3. At trial, the defendant denied knowing the weapon was in his vehicle and told the police that it belonged to his son. *Sims*, 2019 IL App (3d) 170417, ¶¶ 6, 17. The State elicited testimony that approximately one month prior to the offense at issue, the defendant accused his then-girlfriend's son of stealing a .45-caliber gun from his car. *Sims*, 2019 IL App (3d) 170417, ¶¶ 9, 12. After that occurrence, the defendant told his then-girlfriend that he would have his stepson get him another gun because he would not be caught without one. *Sims*, 2019 IL App (3d) 170417, ¶¶ 9, 13. The jury found the

defendant guilty. The defendant appealed, challenging his conviction on the basis that the trial court erred in allowing testimony about him possessing the .45-caliber handgun. *Sims*, 2019 IL App (3d) 170417, ¶ 25.

¶ 135   In determining whether the other-crimes evidence was properly admitted, the reviewing court noted that the State had to prove, *inter alia*, that the defendant had knowledge of the presence of the firearm. *Sims*, 2019 IL App (3d) 170417, ¶ 26. The court noted that knowledge "may be shown by evidence of the defendant's acts, declarations, or conduct from which it can be inferred that he knew the weapon existed in the place where it was found." *Sims*, 2019 IL App (3d) 170417, ¶ 26. The court further observed that knowledge is ordinarily established by circumstantial evidence rather than direct proof. *Sims*, 2019 IL App (3d) 170417, ¶ 26. The court determined that admission of the other-crimes evidence was relevant. *Sims*, 2019 IL App (3d) 170417, ¶ 32. The court explained that since the defendant was not found in possession of the .380-caliber handgun and he denied knowing that the weapon was in his vehicle, testimony that he had previously had a different weapon in his car and regularly kept a weapon in his vehicle was relevant to prove that the defendant had knowledge that a weapon was in his vehicle on the date of the offense. *Sims*, 2019 IL App (3d) 170417, ¶ 32.

¶ 136   Defendant argues that, as in *Sims*, evidence of Terrell's prior gun possession was relevant to proving his knowledge, intent, lack of mistake, lack of accident, and motive in possessing the firearms charged in this case. Defendant contends that the fact that Terrell had a significant history of obtaining, possessing, and using illegal firearms would tend to show that Terrell demonstrated the ability, knowledge, and intent to illegally possess firearms. We find defendant's reliance on *Sims* misplaced. Terrell's history with firearms was not a fact of consequence to the determination of defendant's guilt. At issue in this case was whether defendant jointly possessed the firearms that

were recovered from the room he rented. As noted earlier, defendant does not explain, nor is it clear to us, how Terrell's previous history with firearms makes the proposition of defendant's joint possession of the weapons less likely.

¶ 137 We also point out Terrell's prior arrests with firearms were not under similar circumstances. In *Sims*, the prior possession of the firearm was within 30 days of the charged offense and in the same location (the defendant's vehicle). Further, there was evidence that the defendant in *Sims* regularly kept a gun in his car. Those facts contributed to the finding that the other-crimes evidence was relevant to whether the defendant had knowledge of the weapons found in his car on the day of the offense. *Sims*, 2019 IL App (3d) 170417, ¶ 32. Here, in contrast, Terrell's history with firearms did nothing to make the proposition of defendant's joint possession of the weapons less likely. Terrell's most recent arrest was two years prior to the events at issue. In relation to the offense of threatening a police officer, the proffer was unclear that Terrell even possessed a firearm or merely made a threat and if it was the same arrest or a different arrest as the 2016 possession of heroin and possession of a firearm arrest. Terrell's conviction of disorderly conduct in 2016 for discharging a firearm in Aurora would not be indicative of Terrell having sole possession of the firearms located in the south middle bedroom of the Solfisburg Property. Finally, Terrell's arrest for possession of a replica firearm in 2010 was irrelevant to sole possession as it is a replica and was remote in time—eight years prior. At most, there was a proffer that Terrell possessed guns on two or three occasions in the past. This does not prove that he solely possessed the firearms. We therefore find defendant's argument unpersuasive and hold that the trial court did not abuse its discretion in barring defendant from presenting evidence of Terrell's alleged history of gun possession.

¶ 138                                    C. Terrell's Statements to Police

¶ 139   Lastly, defendant claims that the trial court improperly barred him from presenting evidence that Terrell had made statements to the police after his arrest about parole agents going into "his" room and finding contraband. The State responds that this testimony was properly excluded as inadmissible hearsay. Again, we agree with the State.

¶ 140   During Terrell's direct examination, defense counsel asked him about a statement he made at the police station. The State objected on hearsay grounds. Defense counsel responded that the testimony constituted "an admission by a party opponent, a codefendant." The trial court sustained the objection. Defense counsel later argued that she should be able to ask Terrell about a statement that he made to the police "that parole just came up into [his] house and went straight to [his] room even though [Terrell] told them [he] didn't keep anything there *** [and that] all [his] stuff is on the couch." Defense counsel sought to elicit the statement to show that the south middle bedroom belonged to Terrell. Defense counsel told the trial court that the applicable hearsay exception "would be admission by a codefendent." The trial court stated that it was not familiar with the exception cited by defense counsel. The court acknowledged that there is an exception for a statement made in furtherance of a conspiracy, but there was no evidence of a conspiracy or any statements in furtherance of a conspiracy in that case. The State then objected on the basis of hearsay. The trial court sustained the State's objection.

¶ 141   Hearsay is an out-of-court statement that is offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *Brennan*, 2023 IL App (2d) 220190, ¶ 50. The statement defendant seeks to admit is hearsay as it was a statement made to the police and offered to prove that the south middle bedroom was Terrell's. Hearsay is inadmissible unless the statement falls within a hearsay exception. Ill. R. Evid. 802 (eff. Jan. 1, 2011); *Brennan*, 2023 IL App (2d) 220190, ¶ 50. At trial, defendant argued that Terrell's statement to the police constituted "an admission by

a party opponent, a codefendant." Illinois Rule of Evidence 801(d)(2) (eff. Oct. 15, 2015) provides that a statement made by a party is not hearsay if it is offered in evidence against that party. See *Brennan*, 2023 IL App (2d) 220190, ¶ 59. Here, however, Terrell was not a party to the case. Moreover, defendant does not identify on appeal any other exception to the hearsay rule that would be applicable. As the trial court noted, there is no exception for an "admission by a codefendant," and, although there is an exception for a statement made in furtherance of a conspiracy (Ill. R. Evid. 801(d)(2)(E) (eff. Oct. 15, 2015)), there was no evidence of a conspiracy or any statements in furtherance of a conspiracy. As no hearsay exception applied to Terrell's statement to the police, the trial court did not abuse its discretion in sustaining the State's objection to this evidence on hearsay grounds.

¶ 142                               C. Constitutionality

¶ 143   Next, we address defendant's claim that his convictions of unlawful possession of a weapon by a felon violated his rights under the second and fourteenth amendments to the United States Constitution. U.S. Const., amends. II, XIV. According to defendant, these convictions should be reversed because, using the test recently established in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), for evaluating gun laws, the unlawful possession of a weapon by a felon statute (720 ILCS 5/24-1.1 (West 2018)) is unconstitutional as applied to him where there is no historical tradition for prohibiting persons with no prior convictions of violent crimes from possessing firearms. We reject this argument.

¶ 144   There are two types of constitutional challenges—facial and as applied. *People v. Hilliard*, 2023 IL 128186, ¶ 21; *People v. Mobley*, 2023 IL App (1st) 221264, ¶ 18. A facial challenge requires a showing that the statute is unconstitutional under any set of facts. *People v. Garvin*, 219 Ill. 2d 104, 117 (2006); *Awkerman v. Illinois State Police*, 2023 IL App (2d) 220434, ¶ 37. In

contrast, an as-applied challenge is dependent on the specific facts and circumstance of the individual raising the challenge. *Awkerman*, 2023 IL App (2d) 220434, ¶ 37. As such, when considering an as-applied challenge, the record must be sufficiently developed in terms of those facts and circumstances for appellate review. *People v. Thompson*, 2015 IL 118151, ¶ 37. Here, defendant raises an as-applied challenge.

¶ 145 We observe, and defendant concedes, that he is raising his as-applied constitutional challenge for the first time on appeal. The State, noting that an as-applied constitutional challenge is fact specific and requires adequate development for purposes of review, asserts that defendant's failure to develop this argument in the trial court should result in forfeiture. However, as defendant points out, the supreme court has recognized a narrow exception to the general rule that a defendant must present an as-applied constitutional challenge to the trial court so as to create a sufficiently developed record. *People v. Holman*, 2017 IL 120655, ¶ 32, *overruled on other grounds by People v. Wilson*, 2023 IL 127666, ¶ 42, (considering an as-applied constitutional challenge for the first time on appeal where the record was sufficiently developed to address the claim). Consequently, where, as here, the record is sufficiently developed to address defendant's claim, we will not find the issue forfeited. Defendant's arguments do not require factual development because they are based on caselaw, statutory authority, and the qualified offenses as charged by the State in the indictment against him. The State notes that defendant seeks to differentiate between violent and nonviolent felonies, and, therefore, maintains that the record should be developed as to whether his underlying conviction involved violent circumstances.[2] As discussed later in this decision,

---

[2] In their briefs, the parties reference underlying felony convictions for theft and unlawful possession of a controlled substance. However, at defendant's trial, the State only introduced a

however, we reject the notion that there is a valid distinction between violent and nonviolent felonies for purposes of our analysis. Accordingly, we may address defendant's arguments without further development of the record.

¶ 146    Turning to the merits, we begin by noting that a court must construe a statute so as to affirm its constitutionality, if reasonably possible. *In re Lakisha M.*, 227 Ill. 2d 259, 263 (2008). Thus, if a statute's " 'construction is doubtful, the doubt will be resolved in favor of the validity of the law attacked.' " *People v. Fisher*, 184 Ill. 2d 441, 448 (1998) (quoting *People v. Inghram*, 118 Ill. 2d 140, 146 (1987)). Moreover, as noted earlier, an as-applied constitutional challenge requires a showing that the law is unconstitutional as it applies to the specific facts and circumstances of the challenging party. *Awkerman*, 2023 IL App (2d) 220434, ¶ 37. "All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *People v. Harris*, 2018 IL 121932, ¶ 39. An as-applied constitutional challenge presents a legal question that is reviewed *de novo*. *People v. Kitch*, 2019 IL App (3d) 170522, ¶ 49.

¶ 147    The second amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court invalidated a series of laws enacted in the District of Columbia that prohibited handguns in the home and required other kinds of firearms to be unloaded and disassembled or bound by a trigger lock or similar device. *Heller*, 554 U.S. at 635. The Court held that the second

certified copy of a felony conviction of theft. Thus, to the extent necessary for our analysis, we will only refer to the underlying theft conviction.

amendment confers "an individual right to keep and bear arms" (*Heller*, 554 U.S. at 595) for the "core lawful purpose of self-defense," which the court identified as being "central to the Second Amendment right" (*Heller*, 554 U.S. at 628-30). The Court concluded that the District of Columbia's ban on handgun possession in the home and its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense violated the second amendment's protection of "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635.

¶ 148    But, as the *Heller* court made clear, "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. The Court admonished lower courts that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. The Court also noted that the "presumptively lawful regulatory measures" it identified were merely examples and did not purport to be exhaustive. *Heller*, 554 U.S. at 627, n.26.

¶ 149    Two years after the decision in *Heller*, the Supreme Court decided *McDonald v. City of Chicago*, 561 U.S. 742 (2010). In *McDonald*, the Court held that the second amendment "right to keep and bear arms for the purpose of self-defense" applies to the states through the fourteenth amendment (U.S. Const., amend. XIV). *McDonald*, 561 U.S. at 789-791. As such, the Court struck down laws like the ones it invalidated in *Heller*. *McDonald*, 561 U.S. at 750. In so doing, the Court in *McDonald* reiterated that its decision "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws

forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' " *McDonald*, 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626-27).

¶ 150   Following *Heller*, courts developed a two-pronged analysis to determine whether statutes restricting the use and possession of firearms are constitutional under the second amendment. *Bruen*, 597 U.S. at 17. Pursuant to that analysis, a court would initially address whether the challenged law imposes a burden on conduct falling within the scope of the second amendment guarantee. *Wilson v. County of Cook*, 2012 IL 112026, ¶ 41. This involved a textual and historical inquiry to determine whether the conduct was understood to be within the scope of the right at the time of ratification. *Wilson*, 2012 IL 112026, ¶ 41 (citing *Heller*, 554 U.S. at 634-35, and *McDonald*, 561 U.S. at 785-86). If the conduct fell outside of the scope of the second amendment right, then the regulated activity was categorically unprotected. *Wilson*, 2012 IL 112026, ¶ 41. However, if the historical evidence was inconclusive or suggested that the regulated activity was not categorically unprotected, then the court would conduct a second inquiry into the strength of the government's justification for restricting or regulating the exercise of second amendment rights. *Wilson*, 2012 IL 112026, ¶ 42. Courts generally recognized that this latter inquiry required a form of heightened means-end scrutiny. *Wilson*, 2012 IL 112026, ¶ 42.

¶ 151   In 2022, the Supreme Court decided *Bruen*. At issue in that case was whether "ordinary, law-abiding citizens have a \*\*\* right to carry handguns publicly for their self-defense." *Bruen*, 597 U.S. at 9-10. The Court recognized that following *Heller*, courts employed a two-step framework for analyzing second amendment challenges. *Bruen*, 597 U.S. at 17-18. The Court, however, "decline[d] to adopt" the analytical framework developed after *Heller*. *Bruen*, 597 U.S. at 17. The Court concluded that the two-step approach was "one step too many" and that *Heller*

and *McDonald* "do not support applying means-end scrutiny in the Second Amendment context." *Bruen*, 597 U.S. at 19. Instead, *Bruen* set forth the following test for assessing constitutionality under the second amendment:

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Bruen*, 597 U.S. at 24 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50, n.10 (1961)).

*Bruen* therefore requires a threshold textual inquiry followed, if necessary, by a historical inquiry. Initially, a court must ask whether the second amendment's "plain text" covers an individual's conduct. *Bruen*, 597 U.S. at 24. If the answer to this initial inquiry is affirmative, the government must defend the regulation by showing that it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. To satisfy this burden, the government must show that the challenged law aligns with historical tradition by identifying analogous historical regulations, *i.e.*, those that are " 'relevantly similar' " with respect to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 28-29 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).

¶ 152   Turning to the facts of this case, we address whether the Second Amendment's "plain text" covers the conduct at issue here. In addressing this issue, *People v. Baker*, 2023 IL App (1st) 220328, a recent case from the first district, is instructive. In *Baker*, the defendant raised an as-applied challenge to the unlawful-use-of-a-weapon-by-a-felon statute. The court concluded that,

because the defendant was a convicted felon, "*Bruen* just does not apply to him." *Baker*, 2023 IL App (1st) 220328, ¶ 37. The court elaborated:

"The *Bruen* Court could not have been more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant. *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2156 (the holding was limited to laws affecting 'law-abiding citizens'). Just in case a reader missed the first time that the court said it, the court repeated it 18 times. *Bruen*, 597 U.S. ___, 142 S.Ct. 2111 *passim* (the six justices in the majority repeated the phrase 'law-abiding' 18 times in their majority opinion and their concurrences). Further, Justice Kavanaugh in his concurrence quoted an earlier case that stated: ' "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons ***." ' *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626-27, 128 S. Ct. 2783). Justice Kavanaugh's concurrence was joined by Chief Justice Roberts, and they both joined the six-justice majority opinion. Based on the plain, clear, and repeated language of the justices in the majority, defendant is simply outside the box drawn by *Bruen*." *Baker*, 2023 IL App (1st) 220328, ¶ 37.

¶ 153 Accordingly, and as the State urges, the clear implication of *Bruen* is that "the people" referenced in the second amendment are "law-abiding" citizens. See, *e.g.*, *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) ("Congress did not violate [the defendant's rights] by enacting § 922(g)(1) [(18 U.S.C. § 922(g)(1) (2020) (a federal unlawful-possession-of-a-weapon-by-a-felon statute)]. He is not a law-abiding citizen, and history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of

society."); *United States v. Garrett*, 650 F. Supp. 3d 638, 640 (N.D. Ill. 2023) ("Courts in this jurisdiction and elsewhere have relied on the focus in [*Bruen*, *McDonald*, and *Heller*] on the rights of 'law-abiding' citizens to hold that the government may, consistently with *Bruen* disqualify convicted felons from exercising the rights the Second Amendment guarantees."); *United States v. Coleman*, 2023 WL 122401, at *2 (N.D. W.Va. 2023) ("The Supreme Court notes throughout its decisions that the challenging parties are 'law-abiding' citizens. The implication is clear: the reach of *Bruen* ends at the feet of those individuals who are not law-abiding citizens."); *United States v. Medrano*, 2023 WL 122650, at *2 (N.D. W.Va. 2023) ("The bottom line is [the defendant's] status as a felon removes him from 'the people' enumerated in the Second Amendment."); *United States v. Seiwert*, 2022 WL 4534605, *1 (N.D. Ill. 2022) (quoting *Heller*, 554 U.S. at 635) (noting that the right secured by the Second Amendment "extends only to 'the people,' which encompasses only 'law-abiding, responsible' citizens who keep or bear arms for 'lawful purposes.' "); *United States v. Ingram*, 623 F. Supp. 3d 660, 664 (D. S.C. 2022) ("By distinguishing non-law-abiding citizens from law-abiding ones, the dicta in *Heller* and *McDonald* clarifies the bounds of the plain text of the Second Amendment. This, coupled with the majority's focus in *Bruen* on the Second Amendment rights of 'law-abiding citizens' throughout the opinion convinces this Court that the Supreme Court would conclude that these statutes fail to infringe on any Second Amendment rights."). And, as the concurring opinion of Justice Kavanaugh makes clear, nothing in the court's decision " 'should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.' " *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626-27 and citing *McDonald*, 561 U.S. at 786, 130). Moreover, in his concurrence in *Bruen*, Justice Alito stated that *Bruen* does not "disturb[] anything that we said in *Heller* or *McDonald* *** about restrictions that may be imposed on the possession

of carrying guns." *Bruen*, 597 U.S. at 72 (Alito, J., concurring). As defendant does not dispute that he is a convicted felon for purposes of the unlawful-possession-of-a-weapon-by-a-felon statute, he is not a "law-abiding" citizen afforded the same second amendment protections enjoyed by "the people" referenced in the second amendment.

¶ 154   Defendant contends that the language from *Heller* that the longstanding prohibitions on the possession of firearms by felons are "presumptively lawful" is *dicta*. See, *e.g.*, *People v. Chairez*, 2018 IL 121417, ¶ 24. This argument, however, does not alter our conclusion. First, it was rejected by the Eleventh Circuit Court of Appeals in *United States v. Rozier*, 598 F. 3d 768, 770-71 n.6 (11th Cir. 2010) (stating that "to the extent that this portion of *Heller* limits the Court's opinion to possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta" and that even "to the extent that this statement is [*dicta*], we shall still give it considerable weight." (Emphases in original.)). Second, Illinois courts have credited the impact of *dicta* from the Supreme Court. See, *e.g.*, *People v. Williams*, 204 Ill. 2d 191, 206 (2003) ("Judicial *dicta* have the force of a determination by a reviewing court and should receive dispositive weight in an inferior court."); *People v. Montgomery*, 2016 IL App (1st) 142143, ¶ 14 (opting to follow the *dicta* set forth in *Heller* and *McDonald*).

¶ 155   Even if we presume that, despite his status as a convicted felon, defendant's conduct, *i.e.*, possession of a weapon, satisfies the first part of the *Bruen* test, it fails under the second part. Specifically, defendant argues that the qualifying conviction upon which his unlawful-possession-of-a-weapon-by-a-felon convictions rest (theft) was nonviolent, and there is no well-established and representative historical analogue for barring felons from possessing firearms, much less nonviolent felons. We disagree.

¶ 156    Preliminarily, whether defendant's qualifying convictions were "nonviolent" is irrelevant, as the Supreme Court placed no qualifiers on the word "felons" in either *Heller* or *McDonald*. See *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (observing that "[f]elonies encompass a wide variety of non-violent offenses, and we see no reason to think that the [United States Supreme] Court meant 'dangerous individuals' when it used the word felon" in *Heller*). We also agree with the federal courts of appeal that have concluded that the country's historical tradition of firearm regulation included excluding felons from possessing firearms, as did this court recently in *Awkerman* (*Awkerman*, 2023 IL App (2d) 220434, ¶ 51 (citing *Jackson*, 69 F. 4th at 501-06; *United Stated v. Rahimi*, 61 F. 4th 443, 452 (5th Cir. 2023), *cert. granted*, No. 22-915, ___ U.S. ___, 143 S. Ct. 2688 (June 20, 2023) (distinguishing between disarming a person pursuant to a civil order relating to domestic violence from a convicted felon subject to the longstanding prohibition on the possession of firearms that exclude them from the scope of the second amendment). Indeed, this position was also accepted by the First District of this appellate court in *People v. Brooks*, 2023 IL App (1st) 200435, ¶¶ 90-105. There, the court considered and rejected the defendant's as-applied challenge to the armed habitual criminal statute, raising identical arguments to those defendant raises here. *Brooks*, 2023 IL App (1st) 200435, ¶¶ 90-105. The court determined, under the second step in *Bruen*, that founding-era historical records and Supreme Court precedent provide historical underpinnings for our legislature's prohibition of firearm possession by previously-convicted felons, even if the convictions were for nonviolent felonies. *Brooks*, 2023 IL App (1st) 200435, ¶ 100.

¶ 157    Finally, in his reply brief, defendant acknowledges that while the majority of cases have found that the federal unlawful-possession-of-a-weapon-by-a-felon statute is supported by the historical tradition of the second amendment, this determination is not universal. Defendant cites

three cases in support of this proposition, *Range v. Attorney General*, 69 F. 4th 96 (3d Cir. 2023) (*en banc*), *Rahimi*, 61 F. 4th 443, and *United Stated v. Harrison*, 654 F. Supp 3d 1191 (W.D. Okla. 2023), to support his arguments. We disagree that these cases should alter our conclusion here and note that none of these decisions is binding on us. See *City of Chicago v. Groffman*, 68 Ill. 2d 112, 118 (1977) ("The general rule is that decisions of United States district and circuit courts are not binding upon Illinois courts"); *Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.*, 2012 IL App (1st) 112321, ¶ 37, n.3 (same). Further, we agree with the court in *Baker*, where it pointed out that *Range* concerned disarming those with only *misdemeanor* convictions. See *Baker*, 2023 IL App (1st) 220328, ¶ 38. Thus, *Range* does not apply here. In *Rahimi*, the defendant was charged with possessing a firearm while under a domestic violence restraining order entered in a civil proceeding. *Rahimi*, 61 F. 4th at 449. *Rahimi* is distinguishable from the present case in so far as the court in that case noted that the defendant "was not a convicted felon or otherwise subject to another 'longstanding prohibition[] on the possession of firearms' that would have excluded him from the scope of the second amendment. *Rahimi*, 61 F. 4th at 452 (quoting *Heller*, 554 U.S. at 626). Lastly, in *Harrison*, the defendant was charged with possessing a firearm with knowledge that he was an unlawful user of marijuana. *Harrison*, 654 F. Supp 3d at 1194. *Harrison* does not particularly aid our analysis for two reasons. First, the underlying conviction proffered by the State at defendant's trial was theft, not marijuana use. Second, *Harrison* has been undercut by other federal court decisions. See*, e.g.*, *United States v. Hart*, 2023 WL 4144834 (W.D. Mo. 2023) (declining to follow *Harrison*, noting that challenges "for unlawful user of a controlled substance in possession of a firearm have survived Second Amendment scrutiny after *Bruen*, both in this Court and in other jurisdictions"); *United States v. Lewis*, ___ F. Supp. 3d ___, 2023 WL 4604563 (S.D. Ala. 2023) (recognizing a split of authority as to the

constitutionality of federal unlawful-user-of-a-controlled-substance-in-possession-of-a-firearm statute, but upholding the statute after rejecting the analysis contained in *Harrison*).

¶ 158   In short, defendant is not afforded the same Second Amendment protections enjoyed by "the people" referenced in the second amendment because, as a convicted felon, he is not a "law-abiding" citizen. That defendant characterizes the felonies of which he was convicted as "non violent" is of no moment as the Supreme Court placed no qualifiers on the word "felons" in either *Heller* or *McDonald*. Moreover, courts have concluded that the country's historical tradition of firearm regulation included excluding felons from possessing firearms. We therefore reject defendant's claim that his convictions of unlawful possession of a weapon by a felon should be reversed pursuant to *Bruen*.

¶ 159                                   D. One-Act, One-Crime

¶ 160   Lastly, we address defendant's contention that his convictions of unlawful possession of a firearm without a valid FOID card along with his convictions of unlawful use of a weapon by a felon violate the one-act, one-crime doctrine. The one-act, one-crime doctrine provides that a defendant may not be convicted of multiple offenses based on the same physical act. *Almond*, 2015 IL 113817, ¶ 47 (citing *People v. King*, 66 Ill. 2d 551, 566 (1977)). Whether a violation of the one-act, one-crime doctrine has occurred is a question of law, which we review *de novo*. *People v. Coats*, 2018 IL 121926, ¶ 12. The State concedes that defendant's convictions of unlawful possession of a firearm without a FOID card violate the one-act, one-crime doctrine. We accept the State's concession, and we vacate defendant's convictions of unlawful possession of a firearm without a FOID card, the less serious offense. See *People v. Quinones*, 362 Ill. App. 3d 385, 397 (2005) (vacating one of two aggravated unlawful use of a weapon convictions—one based on the weapon being uncased, loaded, and accessible and the other based on possession without a FOID

card—because both convictions were based on the same single act of possession of a firearm); *People v. Carter*, 344 Ill. App. 3d 663, 672 (2003), *aff'd in part & rev'd in part on other grounds*, 213 Ill. 2d 295 (2004) (holding that conviction of possession of a firearm without a valid FOID card, in conjunction with conviction of unlawful possession of a firearm, violated the one-act, one-crime doctrine because they were based on the same conduct and vacating the conviction of possession of a firearm without a FOID card).

¶ 161                                    III. CONCLUSION

¶ 162   For the reasons stated, we vacate defendant's convictions of unlawful possession of a firearm without a FOID card, but otherwise affirm the judgment of the circuit court of Kane County.

¶ 163   Affirmed in part and vacated in part.